[Civil No. 3151.  Filed May 31, 1932.]

[11 Pac. (2d) 829.]

UNITED BANK & TRUST COMPANY, a Corporation, Appellant, v. W. C. JOYNER, Appellee.

Mr. Stanley Samuelson, Messrs. Kingan & Darnell and Mr. Frederick G. Nave, for Appellant.

Mr. Harlow H. Akers and Mr. H. S. McCluskey, for Appellee.

LOCKWOOD, J.—This is an action to recover the amount alleged to be due on a subscription to buy treasury stock of a corporation.  There is no serious dispute as to the facts, the questions involved being

principally of law, and we may state these facts as follows:

At some time previous to the spring of 1927, certain parties in the city of Tucson attempted to organize a corporation under the name of Tucson Independent Publishing Company, Inc., hereinafter called the company. The incorporators had taken some of the preliminary steps necessary to becoming a legal corporation under the laws of Arizona, but up to the twenty-eighth day of May, 1927, had not completed them. On that day W. C. Joyner, hereinafter called defendant, signed a document, the material parts of which read as follows:

"Tucson Independent Publishing Company
Incorporated
"Treasury Stock
"Tucson, Arizona, May 28th, 1927

"In consideration of the subscription of others of like effect, the mutual promises and agreements herein contained and the benefits and advantages resulting to each of us respectively, I hereby subscribe for and agree to purchase Fifty shares of treasury stock of Tucson Independent Publishing Company, Inc. of Tucson, Arizona, a corporation formed under the laws of Arizona, of the par value of $10.00 per share and agree to pay to the order of the Independent Publishing Company, Inc., of Tucson, Arizona, for said stock the principal sum of Five Hundred Dollars, at United Bank & Trust Co., Bank in Tucson, Arizona, at the time and in the amounts hereinafter set forth.

"Ten per cent (10%) June 1st 1927
"Ten per cent (10%) July 1st 1927
"Ten per cent (10%) Aug. 1st 1927
"Ten per cent (10%) Sept. 1st 1927
"Ten per cent (10%) Oct. 1st 1927
"Ten per cent (10%) Nov. 1st 1927
"Ten per cent (10%) Dec. 1st 1927
"Ten per cent (10%) Jan. 1st 1928
"Ten per cent (10%) Feb. 1st 1928
"Ten per cent (10%) Mar. 1st 1928

" . . . This subscription shall not be binding unless $25,000 of subscriptions similar to this have been obtained prior to August 15, 1927. In the event $25,000 of similar subscriptions have not been obtained by the first date of payment herein mentioned, then the time for making the first payment on this subscription shall be extended until $25,000 of subscriptions have been obtained and subsequent payments shall become due and payable thereafter at the same intervals as above set forth. This subscription is contingent upon the issuance to said corporation by the Arizona Corporation Commissioner, of a permit to sell stock.

"4. No representations, statements or agreements other than as herein recited have been made or are to be binding on said corporation and my entire contract is herein expressed."

A similar document covering another 50 shares of stock was executed by defendant at the same time, and the two were delivered to the company. A short time thereafter United Bank & Trust Company, a corporation, hereinafter called plaintiff, made a loan to the company, and as collateral security for such loan took an assignment of the stock subscriptions aforesaid. Defendant made a few payments thereon, but some time in the fall of 1927 ceased paying and has ever since refused to complete the payments set forth in the agreement.

Some time during the summer of 1928 the company completed the steps required to authorize it to commence business, and on July 14, 1928, a certificate of incorporation was issued it by the corporation commission. On the thirtieth day of July of the same year permit No. 6114 was issued by the commission authorizing the company to sell stock as follows:

" . . . The Arizona Corporation Commission does hereby grant and give unto the said Tucson Independent Publishing Company

"Permission

"To issue and sell 3,000 shares of its unissued capital stock of $10.00 per share, and that the previous issue of 1920 shares of stock as set forth in the application be and the same hereby is approved. . . .

"(B) That unless otherwise expressly ordered securities of the company shall be issued only for cash money, and in no event unless 25% of the total purchase price be paid in cash and provisions for the payment of the remaining 75% be covered by contract calling for payments of definite sums at stated intervals not to exceed six (6) months from date of sale. Contracts calling for deferred payments must be submitted to the Commission for approval."

At some time during the early summer of 1927 defendant assisted in the selling of stock in the company to friends of his. Whether this was before or after he took his own subscription does not appear certain from the record, but it was about that time, and for about two months in 1928 he acted as advertising manager for the company. However, his testimony is that his stock subscription was not in any way contingent either upon his sales of stock to others or upon his position as advertising manager aforesaid.

The substance of the defense is that at the time the contract above set forth was entered into the company had not yet been fully incorporated under the laws of Arizona so that it was not authorized to engage in any business, and particularly not in the business of selling or agreeing to sell its treasury stock, nor had it been issued a permit by the corporation commission authorizing such sale, and that under the laws of Arizona the subscription of defendant was void *ab initio* as being contrary to the public policy of the state declared in its statutes.

The question involves a consideration of a number of the provisions of the Arizona statutes. The com-

pany was unquestionably an "investment company" as defined in paragraph 2259 (Civil Code), Revised Statutes of Arizona, 1913, and such companies were subject to strict regulation by statute, particularly by the following paragraphs in the Code of 1913 which were in force at the time the subscriptions were made.

"2260. *Before offering for sale, or attempting to sell, any stocks,* bonds, or other securities of any kind or character other than those specifically exempted in the preceding section to any person or persons, or transacting business of any kind whatever in this state, excepting that of preparing the instruments hereinafter required, every such investment company, domestic or foreign, shall file in the office of the corporation commission of this state, the following instruments, to-wit: A statement showing in full detail the plan upon which it proposes to transact business; a copy of all contracts, bonds, or other instruments which it proposes to make with, or to sell to, its subscribers; a statement which shall show the name and location of the investment company, and an itemized account of its actual financial condition, and the amount of the property owned by it, and its liabilities, and such other information touching its affairs as the corporation commission may require."

"2263. It shall be the duty of the corporation commission to examine the statements and documents so filed, . . . and if it finds that said investment company is solvent, that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business and proposed contract contains and provides for a fair, just, and equitable plan for the transaction of business, and in its judgment promises a fair return on stocks, bonds, or other securities by it offered for sale, the corporation commission shall issue to such investment company a statement reciting that such company has complied with the provisions of this chapter, . . . *that such investment company is permitted to do business in this state,* and such statement shall also recite in bold type that the corporation commission in no wise recommends the stock,

bonds or other securities to be offered for sale by such investment company."

"2264. It shall be unlawful for any investment company, either as principal or agent, to transact any business, in form or character similar to that set forth in section 1 (Par. 2259) of this chapter, except as is provided in section 2 (Par. 2260) of this chapter, until it shall have filed the papers and instruments hereinbefore provided for."

"2270. . . . Any investment company, domestic or foreign, which shall *do any business or offer or attempt to do any business,* except as provided in section 2 (Par. 2260) of this chapter . . . shall be deemed guilty of a misdemeanor." (Italics ours.)

The provisions are part of what is commonly known as the "Blue Sky Law."

We have had occasion to construe many of these provisions in the case of *Reilly* v. *Clyne,* 27 Ariz. 432, 40 A. L. R. 1005, 234 Pac. 35. After referring to the sections above quoted, we stated as follows:

" . . . The aim of the courts has been to carry out the manifest intention of the statutes, of preventing the public from being imposed upon by questionable and unsound financial schemes of fortune dreamers and dishonest promoters, and to reach all get-rich-quick schemes offering to the general public their stocks and securities, under whatever name they may choose to act. . . .

"Having reached the conclusion that the International Investment & Construction Association is, under the laws of this state, a corporation, or association, and amenable to the laws governing investment companies, and it not having complied with those laws, its sale of its stock or shares to defendant was in violation of law. It follows, then, that the plea of estoppel is easily disposed of. The rule applicable to such a state of facts we believe is well stated in 5 Fletcher, Cyc. Corp., § 3486, as follows:

" 'Stock issued without authority and in violation of law is void, and confers no rights on the person to whom it is issued, and subjects him to no liabilities.

A contract to issue stock in violation of the provisions of the Constitution or of the statute will not be enforced by the courts, nor can damages be recovered for its breach. A person may rescind his contract to subscribe for or purchase such stock and recover back what he has paid for it, upon a tender back or surrender of the certificate, and of any dividends which he·has received; or he may set up the illegality of the stock as a defense 'to an action by the corporation on his subscription. And, since such a contract is illegal and void, it is incapable of ratification. If there is an inherent lack of power in the corporation to issue 'the stock, neither the corporation nor the person to whom it is issued is estopped to question its validity.'

"See, also, 10 R. C. L. 801, § 112; *Scovill* v. *Thayer,* 105 U. S. 143, 26 L. Ed. 968 [see, also, Rose's U. S. Notes]; *Harrill* v. *Davis,* 168 Fed. 187, 22 L. R. A. (N. S.) 1153, 94 C. C. A. 47; *Pruitt* v. *Okl. Steam Baking Co.,* 39 Okl. 509, 135 Pac. 730; *Colby* v. *Title Ins. & Tr. Co.,* 160 Cal. 632, Ann. Cas. 1913A 515, 35 L. R. A. (N. S.) 813, 117 Pac. 913; *Milliken* v. *Haner,* 184 Ky. 694, 212 S. W. 605.

"It is not necessary to consider what might be the effect of the conduct of defendant by way of estoppel if the transaction out of which the note grew had not been in violation of positive law, and we therefore do not enter into that aspect of the case. The contract, being in violation of law, was incapable of ratification."

Since it appears from the foregoing statement of facts that the contract herein sued on was made in violation of the provisions of the statutes, it conferred no rights upon 'the company and will not be enforced by the courts, and defendant was authorized to set up its illegality as a defense to an action by the company on his subscription.

It is contended that defendant having participated in the sale of other similar stock, and having for a time been an agent' of the company, is estopped from setting up the invalidity of his subscription. Since

the transaction, as stated in *Reilly* v. *Clyne, supra,* was in violation of a positive statute, it could not be ratified by estoppel. But it is urged that the parties were *in pari delicto.* This question was disposed of in *Reilly* v. *Clyne* as follows:

"Paragraph 2270, *supra,* makes the act of the plaintiffs in selling or offering to sell stock of the association a misdemeanor. It does not, however, impose any penalty upon one purchasing such stock. The wrong and the penalty both attach to the seller, not to the buyer. Unquestionably the general law is that a party to an illegal contract cannot come into court and ask to have his illegal objects carried out, but where the parties are not *in pari delicto,* and where the law which makes the agreement unlawful was intended for the special protection of the one seeking relief, the rule is different. 9 Cyc. 550. As is said in *Tracy* v. *Talmadge,* 14 N. Y. 162, 67 Am. Dec. 132:

" ' . . . It is safe to assume that, whenever the statute imposes a penalty upon one party and none upon the other, they are not to be regarded as *par delictum.* . . . "And it is very material that the statute itself, by the distinction it makes, has marked the criminal, for the penalties are all on one side." '

"The general rule is found in 13 C. J. 499, § 443, and is stated as follows:

" 'The complaining party is especially protected by the law where the agreement is not illegal *per se* but is merely prohibited, and the prohibition was intended for his protection, and in such case, not being *in pari delicto,* he is entitled to relief. The fact that the penalty is imposed on one of the parties alone shows clearly that the law does not consider them *in pari delicto.'*

"The purpose of the Blue Sky Law is to protect the public against imposition. The defendant was one of the public for whose benefit the law was enacted, and it is said in *Browning* v. *Morris,* 2 Cowp.

790, where a law is enacted 'for the sale of protecting one set of men from another set of men . . . there the parties are not *in pari delicto.'* The rule thus announced has been recognized and enforced in the following cases: *Irwin* v. *Curie,* 171 N. Y. 409, 58 L. R. A. 830, 64 N. E. 161; *Am. Nat. Ins. Co.* v. *Tabor,* 111 Tex. 155, 230 S. W. 397; *Inhabitants of Worcester* v. *Eaton,* 11 Mass. 368; *Ferguson* v. *Sutphen,* 8 Ill. (3 Gil.) 547; *Gray* v. *Roberts,* 2 A. K. Marsh. (Ky.) 208, 12 Am. Dec. 383; *Knowlton* v. *Congress & Empire Spring Co.,* 14 Fed. Cas. 796 (Case No. 7903).

"As bearing upon the questions of *pari delicto* and estoppel, the plaintiffs in their reply to defendant's answer and counterclaim set up that after defendant had bought the 5,000 shares or units of stock he actively participated in the plaintiffs' affairs and acted for a short time as a trustee. They also set up in reply that defendant had brought some kind of suit against plaintiffs, involving his notes and their validity, in which he alleged as a part of the consideration for notes a promise on the part of plaintiffs to make him a trustee, which promise had been breached by plaintiffs. The defendant's demurrer to these replies was sustained and properly so, as we think, for the reason that the replies show defendant's active participation in the plaintiffs' business was subsequent to the transaction out of which the notes arose, and therefore, not *in pari delicto,* and for the further reason, that if the defendant's pleadings in the former suit admitted that one of the considerations of notes was that he should be made a trustee, at the same time it affirmatively shows he never became such trustee. Therefore, if he became a trustee, it was subsequent to the time he bought the 5,000 shares of stock, and, if he did not become a trustee, it does not enter into the question. Besides, who can tell but that the dainty morsel of office held out to defendant may have been the inducing cause of his unfortunate financial venture. He was not at the time of such transaction one of the original

organizers of the association but one of the public for the protection of whom the Blue Sky Laws were enacted.''

But it is contended that the corporation commission did eventually issue a permit to the company ratifying the sale of the stock in question which validated the transaction. Defendant, on the other hand, insists there is no evidence that the ratification applied to his subscription. Be that as it may, we think in either event the subsequent permit will avail plaintiff nothing. We are of the opinion that since the contract was void as against public policy and the positive provisions of the statute when made, the subsequently issued permit of the corporation commission had no power to validate it. It cannot breathe life into an infant which was stillborn.

Under any theory of the case, therefore, had the company brought suit to enforce the subscriptions in question, the trial court would necessarily have rendered judgment in favor of the defendant, and since the subscriptions were not negotiable in their nature plaintiff, having taken the contract as collateral security for a loan, is in no better position than its assignor.

The judgment of the superior court of Pima county is therefore affirmed.

McALISTER, C. J., and ROSS, J., concur.