[Civil No. 3264.  Filed January 5, 1933.]

[17 Pac. (2d) 815.]

GEORGE W. P. HUNT, Appellant, v. THE DOUG-
LAS LUMBER COMPANY, a Corporation, Ap-
pellee.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant.

Mr. H. M. Van Denburgh, for Appellee.

LOCKWOOD, J.—Douglas Lumber Company, a corporation, hereinafter called plaintiff, brought suit against George W. P. Hunt, hereinafter called defendant, and one O. L. Estes, to recover from Estes the value of certain material sold to him by plaintiff, and to foreclose a mechanic's lien on the premises of defendant on which the material was used. The complaint, after the usual formal matters, alleged that the materials for which the lien was claimed were sold to Estes, who at the time had a contract with defendant for the construction of a certain building upon the latter's premises, and "that during all dates and times herein mentioned the defendant O. L. Estes was a contractor duly licensed as is by law required." It then set up the value of the materials ordered by Estes and used in the building aforesaid and that part of such value was paid and part remained unpaid. Estes defaulted, but defendant answered, admitting all the allegations of the complaint except that Estes was a licensed contractor, as set forth above, which was specifically denied, and in connection with such denial it was alleged that Estes had made application for a contractor's license to the proper authorities but had not paid the fee fixed by law therefor, and no license had ever been issued him; that some time after such application he had paid $10 on account thereof but had never paid the balance; that it had been the custom of the registrar of contractors to allow contractors to pay the license fee fixed by law in installments and to make contracts prior to the payment of the full amount, which custom was well known to both Estes and to plaintiff.

Plaintiff demurred to the answer of defendant, which demurrer was sustained, and it having been stipulated that the parties would stand upon their pleadings, judgment went against Estes for the principal sum due for the materials and against defendant that the lien be foreclosed. From said judgment defendant has appealed.

The questions presented are solely of law, there being no dispute as to the facts, and they raise a new and important question, to wit, the constitutionality of chapter 102 of the Session Laws of 1931 and its effect, if constitutional, upon contracts and mechanics' and materialmen's liens. The chapter is lengthy and we therefore state merely its substance. It provides that it shall be unlawful for any persons to act in the capacity of ''contractor'' within the state of Arizona without having a license as provided by the act, subject to certain special exemptions which are not material in this case. The word ''contractor'' is defined as '' . . . a person, firm, copartnership, corporation, association, or other organization, or any combination of any thereof, who for a fixed sum, . . . or other compensation other than wages, undertakes with another for the construction, alteration . . . of any building, . . . or other structure . . . other than to personalty, or any part thereof. . . . ''

Applicants for a contractor's license must submit to the registrar of contractors on proper forms a full description of their business and the owners thereof, and a certificate of two reputable citizens of the county that the applicant is of good reputation, and recommending that the license be granted. The application must be accompanied by a fee of $25 which is to be deposited in a special contractor's license fund and used to carry out the provisions of the act, any unencumbered surplus being paid into the general fund at the end of each fiscal year. The

license issued is not transferable and expires at the end of each fiscal year, but annual renewals may be had upon the payment of a fee of $10. A register of the applications and licenses issued must be maintained by the registrar in an office in Phoenix, which is open to public inspection during office hours, and certified copies of any license issued must be furnished anyone upon the payment of a nominal sum. Any person may file a complaint that a contractor licensed under the act has been guilty of one or more of several things, to wit: (a) Abandonment of a contract without legal cause; (b) diversion of funds received under a contract to any purpose not in accordance with the terms of the contract, with intent to defraud creditors or the owner; (c) any fraudulent act as a contractor by which another is substantially injured; and (d) wilful and deliberate disregard of the building codes, the safety or the labor laws of the state, or any subdivision thereof. Upon filing of a complaint, the registrar must investigate it in the manner set forth in the act, and may, upon a proper showing, suspend or cancel the license. An appeal may be taken from his decision to the superior court and then on certain points to the Supreme Court. When a license is canceled, it cannot be renewed except upon proper showing that all loss caused by the conduct for which the license was canceled has been satisfied. It is further made a misdemeanor for any person to act in the capacity of contractor, as defined in the act, without a license.

It is urged by defendant that, under the terms of this act, any contract between an owner and a contractor who has not taken out a license, as provided by the act, is void, and that no rights of any nature can be predicated upon such contract.

It is the position of plaintiff, on the other hand, first, that the act is unconstitutional, and, second,

that even if it is constitutional, it does not affect plaintiff's right to a mechanic's lien against defendant Hunt's property.

We consider first the constitutional question. The first objection is that the act is in effect a tax levy for revenue and is therefore obnoxious to section 3, article 9, of the Constitution, in that it does not state distinctly the object of the tax. If it is indeed a revenue act, it is unconstitutional, nor does defendant deny this. He contends, however, that it is a police regulation only, and, as such, well within the power of the legislature. This court in the case of *Smith* v. *Mahoney*, 22 Ariz. 342, 197 Pac. 704, had occasion to discuss the difference between a police measure which requires the payment of a license fee merely for regulatory purposes and a revenue measure. In that case we said as follows:

"Whether the enactment was the exercise of the police power of the state or the taxing power depends upon the purposes of the act. Thus we find it stated in 22 Am. & Eng. Enc. of Law, 2d ed., 917;

"'The police power must also be distinguished from the taxing power, and the distinction is this: That the taxing power is exercised for the raising of revenue, while the police power is exercised only for the purpose of promoting the public welfare, and though this end may be attained by taxing or licensing occupations, yet the object must always be regulation and not the raising of revenue, and hence the restrictions upon the taxing power do not apply.'

"And in Cooley's Const. Lim. (6th Ed.) p. 242, it is said:

"'A license is issued under the police power; but the exaction of a license fee with a view to revenue would be the exercise of the power of taxation.'

"In another work of the same eminent author, it is said:

"'The right of any sovereignty to look beyond the immediate purpose to the general effect neither is nor can be disputed. The government has general

authority to raise a revenue and to choose the methods of doing so; it has also general authority over the regulation of relative rights, privileges, and duties, and there is no rule of reason or policy in government which can require the Legislature, when making laws with the one object in view, to exclude carefully from its attention the other. Nevertheless, cases of this nature are to be regarded as cases of taxation. Revenue is the primary purpose, and the regulation results from the methods of apportionment that are resorted to in obtaining the revenue. Only those cases where regulation is the primary purpose can be especially · referred to the police power. 2 Cooley on Taxation (3d Ed.) p. 1127.'

"The distinction between the exercise of the police power of the state and the taxing power pointed out in the foregoing authorities has been recognized in numerous decisions of the courts holding that a license fee imposed under the guise of the police power was in legal effect a tax. We cite some of the cases without any attempt to exhaust the list. *Ex parte Mayes,* 14 Okl. Cr. 696, 174 Pac. 1181; *Ellis* v. *Frazier,* 38 Or. 462, 53 L. R. A. 454, 63 Pac. 642; *Pittsburgh, C. & St. L. Ry. Co.* v. *State,* 49 Ohio St. 189, 16 L. R. A. 380, 30 N. E. 435; *Muhlenbrinck* v. *Commissioners,* 42 N. J. L. 364, 36 Am. Rep. 518; *North Hudson County Ry.* v. *Hoboken,* 41 N. J. L. 71; *Mestayer* v. *Corrige,* 38 La. Ann. 707; *Pitts* v. *Vicksburg,* 72 Miss. 181, 16 So. 418; *Livingston* v. *City Council of Albany,* 41 Ga. 21; *State ex rel. School Dist.* v. *Boyd,* 63 Neb. 829, 58 L. R. A. 108, 89 N. W. 417; *City of Kansas* v. *Corrigan,* 18 Mo. App. 206.

"So then the question here is this: What is the purpose of this enactment? What is the natural effect of putting it into operation? The fundamentals tell us that the purpose must be gleaned from the natural and legal effect of the language employed in the act. But the court will look beyond the mere title or the bare legislative assertion that the provision is for a license to see and determine the real object, purpose, and result of the act. The nomenclature is not so essential. 6 R. C. L. 237; *Loohner* v. *New York,* 198 U. S. 45, 3 Ann. Cas. 1133, 49 L. Ed.

927, 25 Sup. Ct. Rep. 539. [See, also, Rose's U. S. Notes.]''

Taking the language above cited as setting up the standard whereby we shall determine whether or not the measure under consideration is a tax law or a police regulation, we find that the fee fixed is a flat one and not based in any manner on the total amount of business done by the contractor or on the value of any property owned or used by him or involved in the contract. All contractors large or small, whether they have one contract in a year or a dozen, pay the same fee. This fact alone distinguishes it from *Smith* v. *Mahoney, supra,* where the fee paid was based upon the amount of property owned by the licensee. The license fixed, in view of the expenses of administering the act, is of such a size that little, if any, surplus revenue would pass to the general fund of the state by reason thereof.

But not only does the act show on its face that it was not intended to raise revenue thereby, but it appears affirmatively that its whole purpose and effect is to regulate the conduct of persons engaged in the contracting business. It requires the applicant to make a showing of good moral character before a license issues, and, if he is guilty of any fraudulent conduct in the course of his business as a contractor, his license is revoked and he cannot again engage in contracting until he has repaired all damages by reason of such conduct. We are of the opinion that the act clearly shows its purpose was not the raising of revenue but the regulation of the contracting business, and that, within the terms of *Smith* v. *Mahoney, supra,* it is a police measure and not a revenue act.

But, says plaintiff, even assuming for the sake of argument that it is a police measure, it is an unreasonable exercise of the police powers and thus unconstitutional. Its position on this point is that the

contracting business is a lawful and legitimate one; that the only regulation thereof which is justified under the police power is one which will aid in determining the capacity of the contractor to perform his work properly and that, since the act provides for no examination as to his professional qualifications, it is not a reasonable police measure. We have been cited to but one case under a statute which is practically the same as that in the case at bar. In *Alvarado* v. *Davis et al.*, 115 Cal. App. (Supp.) 782, 6 Pac. (2d) 121, the construction of the California statute regulating contractors, which is almost identical in its terms with ours, was under consideration, and, while the constitutional question was not specifically passed on, the court assumed the act to be constitutional, stating:

"The act is intended for the protection of the public. Control over the contractor is given to the director of professional and vocational standards through the power to revoke licenses for fraudulent and illegal practices. And, while an examination is not made a condition precedent to the granting of a license, the entire object of the statute is that protection of the public against fraudulent and illegal practices which has always been recognized as a distinctive characteristic of statutes which are not mere revenue measures. *Levinson* v. *Boas,* 150 Cal. 185, 193, 88 Pac. 825, 11 Ann. Cas. 661, 12 L. R. A. (N. S.) 575; *Payne* v. *De Vaughn,* 77 Cal. App. 399, 403, 246 Pac. 1069; *Van Wyke* v. *Burrows,* 98 Cal. App. 419, 277 Pac. 190."

This decision, however, was not by the Supreme Court of California but by the appellate division of the superior court of Los Angeles county and plaintiff urges with great vehemence that it is unworthy of consideration for that reason.

Be that as it may, the decisions of the Supreme Court of the United States, even in matters where they are not binding upon a state court, are certainly

entitled to the most respectful and serious considera-
tion by any appellate tribunal, and we think the gen-
eral principles laid down by that court in the case
of *Hawker* v. *People of the State of New York,* 170
U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002, are appli-
cable to the situation in the present case. An act of
the legislature of New York provided that any person
who, after the conviction of a felony, should attempt
to practice medicine should be guilty of a misde-
meanor. Defendant was indicted for practicing medi-
cine after having been convicted of a felony. He ad-
mitted the previous conviction but claimed that the
act denying him the right to practice thereafter was
unconstitutional. There are two points involved, one
as to whether the act was an *ex post facto* law, which
has no bearing on the case at bar, and the other the
power of the state to make moral character one of the
tests of the right to practice medicine. The court in
its opinion stated as follows:

" . . . On the other, it is insisted that, within
the acknowledged reach of the police power, a state
may prescribe the qualifications of one engaged in
any business so directly affecting the lives and health
of the people as the practice of medicine. It may
require both qualifications of learning and of good
character, and, if it deems that one who has violated
the criminal laws of the state is not possessed of
sufficient good character, it can deny to such a one
the right to practice medicine; and, further, it may
make the record of a conviction conclusive evidence
of the fact of the violation of the criminal law, and of
the absence of the requisite good character. In sup-
port of this latter argument, counsel for the state,
besides referring to the legislation of many states
prescribing in a general way good character as one
of the qualifications of a physician, has made a col-
lection of special provisions as to the effect of a con-
viction of felony. In the footnote will be found his
collection.

"We are of opinion that this argument is the more applicable, and must control the answer to this question. No precise limits have been placed upon the police power of a state, and yet it is clear that legislation which simply defines the qualifications of one who attempts to practice medicine is a proper exercise of that power. Care for the public health is something confessedly belonging to the domain of that power. The physician is one whose relations to life and health are of the most intimate character. It is fitting, not merely that he should possess a knowledge of diseases and their remedies, but also that he should be one who may safely be trusted to apply those remedies. *Character is as important a qualification as knowledge,* and if the legislature may properly require a definite course of instruction, or a certain examination as to learning, it may with equal propriety prescribe what evidence of good character shall be furnished. These propositions have been often affirmed. In *Dent* v. *West Virginia,* 129 U. S. 114, 122, 9 Sup. Ct. 231, 233 [32 L. Ed. 623, 626], it was said in respect to the qualifications of a physician: 'The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity *as well as of deception and fraud.*' " (Italics ours.)

The case of *People* v. *Wagner,* 86 Mich. 594, 49 N. W. 609, 24 Am. St. Rep. 141, 13 L. R. A. 286, contains the following language:

" . . . The police power of a state is not confined to regulations looking to the preservation of life, health, good order, and decency. Laws providing for the detection and prevention of imposition and fraud, as a general proposition, are free from constitutional objection. . . . "

And in the case of *State* v. *Robinson,* 42 Minn. 107, 43 N. W. 833, 6 L. R. A. 339, involving an ordinance of the city of Minneapolis licensing hackmen and draymen, the court said:

" . . . The provision of the charter referred to is a grant of police power designed to operate alone upon those who are engaged in business in the city as carriers of persons or property for hire, and to so regulate them as to prevent extortion, imposition, or wrong to strangers or others who employ them for that purpose. This is a rightful exercise of the police power, and one which has never been questioned. . . . "

It is well known to all who have the slightest acquaintance with the contracting business as it is frequently conducted, that it is not an uncommon practice for contractors, who find that the fulfillment of the contract will cause a loss, to abandon the same without legal excuse, thereby causing considerable extra cost to the owner of the building. It frequently happens that the owner pays to the contractor funds which under the contract should be used in the satisfaction of bills for materials or labor, and the latter diverts such funds to other purposes, leaving the owner under the necessity of paying a second time to avoid a lien on his property. Often the contractor departs from the terms of the contract without the knowledge of the owner, to the latter's loss, or wilfully and deliberately disregards the building codes and the safety and labor laws, to the injury not only of the owner but of the workmen upon the building.

We think it obvious that any statute which reasonably tends to discourage practices of this kind by contractors is calculated to protect the public welfare, and is well within the legitimate exercise of the police power. Does the statute in question have this effect? Under its terms any contractor must first, in order to obtain a license, show by the indorsement of two reputable citizens of the county that he has a good reputation. Obviously a man of good reputation is far less likely to indulge in the dishonest or fraudulent practices named in the act than is one whose

character or reputation is not good. But the protection granted does not stop here. Notwithstanding a previous good reputation, a man may perhaps fail to justify that reputation. If, however, complaint be made and he is found delinquent, his license will be taken away and may not be renewed until he has repaired the damage which he has caused. Under such circumstances, while the public might be defrauded once by a contractor, it is not likely to be defrauded a second time by the same person. There can never be two successive unrepaired wrongs by the same contractor if the act is enforced as written.

The register of contractors is open to the public and any person desiring to reassure himself may determine that the contractor whom he intends to engage, if on the register, has never been guilty of an unsatisfied wrong against a property owner, a materialman, or workman. We are of the opinion that the act is within the police power of the state, and not subject to any of the constitutional objections raised herein.

But even admitting such to be the case, what, if any, effect does the failure of the contractor to secure a license have upon the rights of plaintiff in the case at bar? It is the general rule of law that where a statute expressly forbids a person from entering into a certain kind of contract until he performs some precedent act, and imposes a penalty upon such person for attempting to enter into the forbidden contract, the contract itself is absolutely void *ab initio* and the party penalized has no rights thereunder, and the other party to the contract, who was not required to perform any precedent act and who is not penalized by the statute, is not *in pari delicto* and may repudiate the agreement and stand on his rights as if no contract had ever been made. *United Bank & Trust Co.* v. *Joyner,* 40 Ariz. 229, 11 Pac. (2d) 829;

*Reilly* v. *Clyne*, 27 Ariz. 432, 234 Pac. 35, 40 A. L. R. 1005. In the Reilly case it was held:

"Where a statute pronounces a penalty for an act, a contract founded on the act is void, although the statute does not declare such contracts to be void nor expressly prohibit them. . . . "

And in the Joyner case we said:

" . . . Since it appears from the foregoing statement of facts that the contract herein sued on was made in violation of the provisions of the statutes, it conferred no rights upon the company and will not be enforced by the courts, and defendant was authorized to set up its illegality as a defense to an action by the company. . . . "

We further held in the Joyner case that such contract could not be validated, and that no estoppel could be raised thereby as between the parties or their privies. The cases cited involved the sale of stock without a permit from the corporation commission in violation of the Blue Sky Law, but there are cases from other states even more in point.

In the case of *Gardner* v. *Tatum*, 81 Cal. 370, 22 Pac. 880, a physician, who had not secured a certificate authorizing him to practice medicine as required by the laws of California, rendered services and thereafter brought suit against his patient and the court held he could not recover.

In *Payne* v. *De Vaughn*, 77 Cal. App. 399, 246 Pac. 1069, an architect who was not licensed to practice his profession sought to recover for services and it was held that, since the act made it a misdemeanor for him to practice architecture without a license, any contract made by him was void and he could not recover. Many more cases of a similar nature might be cited, but the foregoing are sufficient.

We hold, therefore, that, as between Estes and defendant Hunt, the contract was void and had this

action been by the former against the latter no recovery could have been had. Plaintiff contends, however, that it should not be penalized for the acts of Estes when it furnished the materials in good faith, relying on its right to a lien if Estes failed to pay, since it was in no way a party to the void contract. Is it in a position to make this claim? The right of a third party to create a liability for a lien against the property of another is based solely on the provisions of section 2020, R. C. 1928, which reads as follows:

"Attaches to property: contractor agent of owner. Every person who may labor or furnish materials, machinery, fixtures or tools to be used in the construction, alteration or repair of any building or other structure or improvement whatever, shall have a lien on the same for the work or labor done or materials, machinery, fixtures or tools furnished, whether said work was done or articles furnished at the instance of the owner of the building, or improvement, or his agent. Every contractor, sub-contractor, architect, builder or other person having charge or control of the construction, alteration, or repair, either in whole or in part, of any building, structure or improvement, shall be held to be the agent of the owner for the purposes of this article, and the owner shall be liable, under the terms hereof, for the reasonable value of labor or materials furnished to his agent."

It appears from this section that only the owner in person or his agent can incur liabilities which may become a lien on the property. In this case there is no claim that defendant Hunt purchased the materials involved, but it is contended that Estes was his agent under the last sentence of the section. It will be seen that the agency declared by the statute is based solely on a contractual relation which exists between the owner and the person declared by the statute to be his agent, and it is urged by defendant that, since the contract between himself and Estes was

void, the relationship upon which alone the existence of an agency is predicated does not exist and therefore there could be no agency, and since any liability of the owner rests upon an agency, if there is no agency there is no lien. It is obvious that the agency declared in the statute only exists in case a certain previous contractual relation has been entered into between the presumed agent and the owner. Since we have held as a matter of law no such relationship did exist between defendant and Estes, it would seem to follow that the latter was not the former's agent to bind the premises of defendant through his purchase of materials from plaintiff. *Ex nihil nihil,* and from a void contract which purports to create a certain status no such status can arise. Had plaintiff had actual knowledge of the facts which made the contract between Estes and defendant void, it certainly could not have claimed a lien, because at the time it furnished the materials it would have known the status upon which alone the right of Estes to create a liability for a lien depended did not exist.

But had it such knowledge? There is nothing in either the pleadings or the evidence to show that it did. On the contrary, it appears that it knew Estes had applied for a license and its natural presumption, in the absence of evidence to the contrary, would be that he had secured it. It is said, however, that the register of contractors provided for in the act is constructive notice to the world that persons whose names do not appear thereon are not licensed contractors. It is the general rule that public records such as the one involved herein are not constructive notice unless expressly made so by statute. *Union Trust Co.* v. *Hendrickson,* 69 Okl. 277, 172 Pac. 440.

The statute in this case does not, as does the statute applying to records in the office of the county recorder, expressly make the register of contractors

constructive notice to anyone, and, in view of the great responsibility imposed on parties by this doctrine, we think that unless the statute expressly and explicitly does make a public record constructive notice it does not become such. For this reason we hold that the register of contractors did not give constructive notice to plaintiff of the status of Estes.

We have then the following situation: Defendant had authorized Estes to proceed with the improvements on his premises and plaintiff had knowledge of that fact. It had no knowledge that, as a matter of law, the contract apparently existing between defendant and Estes, and which, if it did exist, made Estes the agent of defendant for the purpose of fixing a lien, was void. Under these circumstances the situation was that frequently existing where the relation of principal and agent is involved. Where A by his conduct leads B to believe C is A's agent, the latter is estopped from denying the agency. *Townsend* v. *Chappell*, 12 Wall. 681, 20 L. Ed. 436; *Buckley* v. *Silverberg*, 113 Cal. 673, 45 Pac. 804; 2 C. J. 461. We think defendant herein is estopped so far as plaintiff is concerned from denying the existence of a valid contract, and therefore a statutory agency, between himself and Estes. The judgment of the superior court of Maricopa county is affirmed.

McALISTER, J., concurs.

ROSS, C. J., Concurring in Part.—If this were an action by the contractor, Estes, against the owner, Hunt, for a balance due under his contract, and to impress a lien therefor on the building constructed under the contract, it would present for our determination the interesting question whether Estes, he not having obtained a contractor's license under chapter 102, Laws of 1931, could recover, because said chapter provides not only that contractors such as Estes shall

obtain a license, but also provides a punishment by fine or imprisonment, or both, for "any person . . . acting in the capacity of contractor . . . without a license." (Section 12.)

If the action were between the contractor and owner, the constitutionality of chapter 102 might also be involved. The action is not between the contractor and the owner, and, therefore, any ruling on the constitutionality of the law or on the validity of the contract, as between the owner and the contractor, is beside the question.

This is an action by a materialman (the Douglas Lumber Company) for the reasonable value of the materials furnished at the request of the contractor, Estes, and put into the owner's building, and to impress the building with a lien therefor. It is not an action to recover of the owner. It is not based upon contract with the owner. It is a right created by the statute in favor of laborers and materialmen who have performed labor or furnished material for the building at the instance of the owner or his agent. *Harbridge* v. *Six Points Lumber Co.*, 17 Ariz. 339, 152 Pac. 860. Section 2020 of the Revised Code of 1928 makes "every contractor, sub-contractor, architect, builder or other person having charge or control of the construction, alteration, or repair, either in whole or in part, of any building, structure or improvement . . . the agent of the owner for the purposes of this article," and further makes the owner liable for the reasonable value of labor and materials furnished to such agent. The contractor, Estes, was therefore the agent of the owner in ordering the materials from the plaintiff lumber company. The fact that Estes had failed to obtain a license under chapter 102 before entering into the contract with the owner did not make him any the less a contractor and the agent of the owner. True, he might not, not having ob-

tained a license, be able to collect the contract price, or any part thereof, from the owner; but he was nevertheless a contractor and the agent of the owner in ordering the materials. His inability to collect for his services, if it existed, did not destroy his character as a contractor. If he was not a "contractor," then he was not subject to the terms of chapter 102, *supra,* requiring a license. But the majority opinion says he was a "contractor" under such chapter. It is dead certain that he was not a trespasser. He was on the owner's premises with his consent constructing the building under a contract and was therefore the owner's agent.

The law provides that "any person desiring to practice as an architect" shall register and makes it a misdemeanor for him to practice his profession without complying with such law. Section 2499 et seq., Rev. Code 1928. Section 2020, *supra,* makes an architect in charge or control of any construction, alteration or repair the agent of the owner. Suppose a case where the architect had not registered with the state board of registration. Under the reasoning of the majority opinion it would be just too bad for a materialman or laborer to furnish material or labor at his request, because he is not, what he and everybody else thinks he is, an "architect," not having registered, and therefore incapacitated to act as the owner's agent.

There is no statute or law that I know of that would defeat the lien of a materialman or laborer if he knew when furnishing materials or performing labor that the contract between the owner and the contractor was for any reason void or unenforceable as between them. If his labor or material enters into the building or structure at the instance of the owner or his agent, the law says, in plain and unmistakable language, that he is entitled to a lien thereon

for its reasonable value; and to make his rights dependent upon the validity of the building contract, or the rights of the contractor and owner as between themselves, is doing something that the law does not even squint at, much less authorize. I can imagine the legislature's amazement, as also that of the bar, when told that the law regulating and licensing contractors has modified or changed the mechanics' lien law.

The doctrine of estoppel has no place in this case. Nobody was misled or deceived. The plaintiff did not furnish the materials that went into the owner's building because of anything said to it by the owner nor because of the owner's silence when he should have spoken. It is said the plaintiff did not know that the contractor had no license under chapter 102. It can be said with equal truth and propriety that the owner, so far as the record shows, had no notice or knowledge that the contractor had no license. The plaintiff did not know what the contract between the owner and the contractor provided, and it is not necessary that it should have known. If the building cost more than the contract price, or if the owner paid the whole contract price to the contractor, nevertheless under the law the materialman and the laborer may impress the property with a lien for any sum due them, but not on the ground of estoppel. The contractor may not apply a dollar of the contract price paid to him by the owner towards liquidating the labor and material account, but that does not affect the rights of the laborer and materialman to a lien. The contractor may have taken the contract for twenty-five or fifty per cent. of the cost of the structure but that will not defeat the mechanics' liens. The owner is liable under the law for the reasonable value of the materials furnished for his building and the reasonable value of the labor performed on it,

even though far in excess of the contract price, because the statute says so and not on any theory of estoppel.

I concur in the result of the majority opinion but cannot follow the reasons given to sustain it. I regret that it contains any expression weakening, or tending to weaken or undermine the mechanics' lien law.