368 P.2d 645

**D. H. JACKSON, Appellant,**

v.

**P. R. ROBERTSON, R. O. Nierstheimer, J. W. Walker, and J. E. Meacham, Appellees,**

**and**

**Octave Gold Mining Corporation, a corporation, Appellee/Cross-Appellant.**

**No. 6750.**

Supreme Court of Arizona.

En Banc.

Jan. 24, 1962.

Rehearing Denied March 20, 1962.

Moore & Moore, Phoenix, for appellant.

Gust, Rosenfeld, Divelbess & Robinette, Phoenix, for appellees Robertson Nierstheimer, Walker, and Meacham.

Favour & Quail, Prescott, for appellee/cross-appellant Octave Gold Mining Corp.

UDALL, Vice Chief Justice.

The principal question presented by this appeal is whether a provision in a contract between joint venturers calling for the issuance of corporate stock not then registered in accordance with the Arizona Securities Act renders the contract illegal and therefore unenforceable.

Plaintiff D. H. Jackson, his wife and his attorney were the incorporators and directors of Octave Gold Mining Corporation when it was lawfully incorporated in 1953. At that time the corporation had neither assets nor stockholders and carried on no business. But plaintiff personally owned a number of leases on unpatented placer mining claims in Yavapai County and a lease with an option to buy the nearby patented Octave Gold Mine. In addition he owned a placer gold gravel washing plant or dredge. Plaintiff planned to carry on a placer mining operation on these claims, using for the washing process the water which had collected in the underground workings of the Octave Mine. Save for preparation of an elaborate brochure describing the details and possibilities of such a venture nothing came of the scheme until September of 1956.

At that time defendants Robertson and Nierstheimer, mining engineers from Alaska, were introduced to the plaintiff and on September 14, 1956 the three agreed to substantially the following plan. Plaintiff was to (and subsequently did) transfer title to

his placer claim leases and dredge to the corporation. In return defendants were to take up the option on the Octave mine (for $8,500), purchase what additional equipment was necessary to commence operating and convey title to these properties to the corporation. The agreement also provided that defendants would actively assist plaintiff, who was to be general manager, in the operation of the mine. Finally, the agreement called for the corporation to issue all of its authorized capital stock [1] in the following percentages: thirty (30) percent each to Jackson, Robertson and Nierstheimer, and five (5) percent each to Walker and Meacham who it appears did little more than introduce defendants to the plaintiff.

On September 14, 1956 a proposal embodying the above terms was submitted to and accepted by the corporation whose directors then were plaintiff and the two defendants.[2] The above described agreement (including the stock issue provisions) was reduced to a written contract between plaintiff and defendants on December 20, 1956. During the period before and after the contract defendants expended approximately $70,000 on the purchase of equipment and supplies necessary for the operation.

In March of 1957 defendants returned to Alaska to handle some unfinished business and gave plaintiff a four-month option to buy their interest for the amount of their cash investment in the project plus twenty percent thereof. Defendants planned to continue the operation when they returned barring exercise of the option by plaintiff. Shortly thereafter, however, (April) plaintiff filed this suit for alleged breach of contract. In addition to damages [3] for the alleged breach by the individual defendants, he requested that the court order issuance of thirty (30) percent of the corporation's stock to him and that the corporation be restrained from issuing any shares to the individual defendants. Defendant corporation counterclaimed against plaintiff for the value of certain items of its machinery sold by the plaintiff subsequent to defendants leaving for Alaska.

The matter came to trial in December of 1957. The jury returned interrogatories and verdicts favorable to plaintiff and against

---

1. The corporate charter provides that: "The amount of capital stock of this corporation shall be Five Hundred Thousand Dollars ($500,000.00) divided into 500,-000 shares of the par value of $1.00 each * * *."

2. Plaintiff's wife and attorney resigned immediately after the nomination and election of defendants Robertson and Nierstheimer as additional directors on September 14, 1956.

3. Plaintiff alleged his damages as follows: $60,000—the value of the dredge; $200,-000—the value of the placer claims as enhanced by the presence of the water in the old Octave Mine workings—(plaintiff paid $40 to obtain and $20 monthly to retain these leases); and $1000 per week for loss of profits since February 1, 1957.

defendants Robertson and Nierstheimer, and also found for the corporation on its counterclaim against plaintiff.[4] On January 31, 1958, however, the Superior Court set aside the verdict for plaintiff against Robertson and Nierstheimer on the grounds that (1) the contract in question was null and void because violative of the Securities Act, and (2) lack of evidence to substantiate plaintiff's alleged damages. Further, and in order to do equity, the corporation was ordered to reconvey the personal and real property to the respective parties from whom it received same. Finally, the court set aside the verdict for the corporation against plaintiff on the ground that plaintiff had sold such items to preserve the remainder of the property at the mine site.

On appeal plaintiff contends that the Securities Act does not reach this type of transaction because it involved a joint venture. Rather, he argues, the corporation was only a convenient receptacle into which the business assets could be placed and by which the venturers would conduct the operation. It must be admitted that the proposition that a joint venture is beyond the pale of the Blue Sky laws has been made, usually in dicta,[5] in some cases. See, e. g., Brown v. Cole, 155 Tex. 624, 291 S.W.2d 704, 59 A.L.R.2d 1011 (1956), noted in 35 Tex.L.Rev. at 127; Polk v. Chandler, 276 Mich. 527, 268 N.W. 732 (1936). And in Hathaway v. Porter Royalty Pool, Inc., 296 Mich. 90, 112, 295 N.W. 571, 579–580, 138 A.L.R. 955 (1941) the Michigan court held:

" * * * that the agreement in question was an agreement for a joint adventure; that the formation of the corporation pursuant to the agreement in no way changed the relationship of joint adventure between the parties; that the agreement for the use of the corporate medium was only a convenient method of carrying into effect the joint adventure, and was not a contract within the prohibition of the blue sky law; that the issuance of stock by the corporation to the pool members was not the sale of securities, within the intendment of the statute."

But we are not persuaded that such is the better view. For, if use of the corporate form by joint venturers violates the Securities Act the public may be injured nonetheless. In this regard the following language of the Supreme Court of Missouri is apposite:

" * * * [A]ppellants * * * contend that 'The Missouri Securities

---

4. The jury found the value of the dredge to be $40,000 and awarded plaintiff Jackson a total verdict of $53,000. The award to the corporation for plaintiff's unauthorized conversion of corporate property was $8,000.

5. That this question has rarely if ever been squarely presented to a court of last resort see Cross v. Pasley, 270 F.2d 88, 91–92 (8th Cir. 1959), cert. denied, 362 U.S. 902, 80 S.Ct. 608, 4 L.Ed.2d 554 (1960).

'Law' is not applicable to the transactions here, because the parties were all engaged in a series of joint adventures. However, if the conceded facts * * * clearly bring the mentioned transactions within the provisions of the mentioned Act, it is immaterial whether the parties were engaged in a series of joint adventures or whether joint adventures generally are under the Act."

Covert v. Cross, 331 S.W.2d 576, 583 (Mo. 1960).

We think, moreover, that the purpose and spirit of the Arizona Securities Act (A.R.S. §§ 44–1801–2037 (1956)) and the decisions of this court thereunder require affirmance on the illegality issue. In Reilly v. Clyne, 27 Ariz. 432, 441, 234 P. 35, 38, 40 A.L.R. 1005 (1925) the purpose of the so-called Blue Sky Law was stated as that of:

"* * * preventing the public from being imposed upon by questionable and unsound financial schemes of fortune dreamers and dishonest promoters, and to reach all get-rich-quick schemes offering to the general public their stocks and securities, under whatever name they may choose to act."

See generally Loss and Cowett, Blue Sky Law, 3–10, 17–42 (1958).

In Reilly this court went on to quote with approval the following from Fletcher on Corporations:

" 'A contract to issue stock in violation of the provisions of the Constitution or of the statute will not be enforced by the courts, nor can damages be recovered for its breach.' " 27 Ariz. at 443, 234 Pac. at 39.

Seven years later in United Bank, Etc., Co. v. Joyner, 40 Ariz. 229, 11 P.2d 829 (1932), in affirming a Superior Court judgment denying recovery on a stock subscription contract, this court held that:

"Since * * * the contract herein sued on was made in violation of the provisions of the statutes, it conferred no rights upon the company and will not be enforced by the courts, and defendant was authorized to set up its illegality as a defense to an action by the company on his subscription." 40 Ariz. at 235, 11 P.2d at 832.

█ It is true that the expressions in Reilly and Joyner were made in the context of stock subscription suits where members of the investing public were involved. And it is no less obvious that the Securities Act was not enacted to protect any of the parties to this law suit. Nevertheless, the contract herein called for issuance of corporate securities which might very well have been foisted upon the investing public by any of the five men involved. It is the capacity for harm and danger to the public as well as accomplished fraudulent transactions to which the Securities Act is directed. The

Act is designed to be prophylactic if possible, remedial only if necessary. In this regard see Domestic & Foreign Petroleum Co., Ltd., v. Long, 4 Cal.2d 547, 558, 51 P.2d 73, 77–78 (1935) wherein the Supreme Court of California observed that:

"By providing for the investigation of proposed securities before they are issued our legislation aims 'to regulate and control the class and character of securities or investments that might be offered to the public.' * * * Securities originally issued in *bona fide* private transactions may subsequently be offered to the public.

\* \* \* \* \* \*

"[I]t is of special importance that the corporation commissioner should have authority to investigate all securities at the time of their original issuance."

A.R.S. § 44–1841 provides in pertinent part:

"A. It is unlawful to sell or offer for sale within or from this state any securities unless such securities have been registered by description under §§ 44–1871 through 44–1875 or registered by qualification under §§ 44–1891 through 44–1900, except securities exempt under § 44–1843 or securities sold in exempt transactions under § 44–1844.

"B. A person violating this section is guilty of a felony * * *."

Section 44–1801 in turn defines "Sale" or "sell" to cover:

"* * * a sale or other disposition of a security or interest in a security for value, and includes a contract to make such sale or disposition."

Here the contract called for a subsequent issuance of unregistered securities. The securities themselves would not be exempt. A.R.S. § 44–1843. Nor would the transaction (issuance to the parties to this lawsuit) be exempt under A.R.S. § 44–1844.[6]

In a case such as this the principle stated by Lord Holt, C. J., in Bartlett v. Vinor, Carth. 252, 90 Eng.Rep. 750 (K.B. 1692) is applicable:

"* * * [E]very contract made for or about any matter or thing which is prohibited and made unlawful by any statute, is a void contract, tho' the statute it self doth not mention that it shall be so, but only inflicts a penalty on the offender, because a penalty implies a prohibition, tho' there are no prohibitory words in the statute."

That this principle has been applied by this court see Northern v. Elledge, 72 Ariz. 166, 171, 232 P.2d 111, 114 (1951) wherein it was held that "a contract founded upon an act

6. Here only one of the parties (plaintiff D. H. Jackson) was an original incorporator. The exempting provisions should be and have been strictly construed. See Trump v. Badet, 84 Ariz. 319, 324, 327 P.2d 1001, 1005 (1958).

for which a penalty is imposed by statute is void."

Accordingly, the trial judge was correct in holding that the contract was void and unenforceable as being contrary to public policy. It follows that his decree rescinding the contract and ordering the corporate properties to be reconveyed to the respective parties was proper. The trial court was also correct in holding that plaintiff Jackson's sale of corporate assets was necessary to protect the remainder of the corporate property. For these reasons the judgment is affirmed.

BERNSTEIN, C. J., and STRUCKMEYER, JENNINGS and LOCKWOOD, JJ., concur.