[Civil No. 3207.   Filed November 16, 1932.]

[15 Pac. (2d) 946.]

R. N. DAVIS, Appellant, v. JAMES R. DUNSEATH, Appellee.

Mr. Clifford R. McFall and Mr. Henderson Stockton, for Appellant.

Messrs. Kingan, Darnell & Nave and Mr. Samuel L. Pattee, for Appellee.

ROSS, J.—The plaintiff, James R. Dunseath, as assignee commenced this action to recover from R. N. Davis, defendant, the sum of $1,500 and interest at seven per cent., as evidenced by a note dated Jan-

uary 31, 1930, given by Davis to the Realty Mortgage & Bond Company, hereinafter referred to as the company, for 200 shares of its stock, of the par value of $50 per share. The defendant in his amended answer admitted the execution and delivery of the note for the consideration alleged, but denied liability on the ground that the company was an investment company, as defined by chapter 38, Revised Code of Arizona 1928 (section 1887 et seq.), subject to the Blue Sky Law, and had not complied with such law, and had not obtained from the corporation commission any permit to sell stocks, bonds and other securities.

The trial was before the court sitting without a jury and resulted in a judgment in favor of the plaintiff. Defendant has appealed.

We state the facts as disclosed by the pleadings, the admissions of the parties and the evidence. The promoters of the company were Allan Heskett, Conger Poage, Lynn D. Smith and the plaintiff, James R. Dunseath. On January 12, 1929, these four persons entered into a written contract based upon "mutual covenants . . . and the sum of one dollar each to the other in hand paid" to organize "a corporation for the purpose of doing business as a mortgage and loan company, and such other purposes as the parties hereto may deem necessary or expedient," capitalized at $250,000, divided into 5,000 shares, of the par value of $50 per share. In said agreement the stock of the company was appropriated as follows: 630 shares each or 2,520 shares to the four promoters. On the same day these promoters held a preliminary meeting, and the minutes of that meeting show, as we read and interpret them, that it was agreed that the balance of the capital stock, 2,480 shares, par value $124,000, should be retained by the proposed corporation "to be used for the purpose of obtaining sufficient capital to have on hand for the

purpose of carrying on the business of the corporation."

In pursuance of this agreement, the company was organized by the above promoters, and on February 26, 1929, they received from the corporation commission a certificate to that effect. Their pre-organization meetings and their meetings as directors and stockholders disclosed their plan of financing the corporation to be to sell to the public 2,480 shares of the capital stock left in the treasury after they appropriated 2,520 thereof, and to issue and sell to the public $100,000 twenty-year bonds of the company, in denominations of $100, $500 and $1,000, bearing interest at seven per cent. payable semi-annually. Each bond purchaser was to receive as a bonus five shares of stock of the company on the basis of every $1,000 worth of bonds purchased. The money secured upon the sale of the company's bonds was to be invested in Tucson real estate.

To make a showing that the company had some assets, Poage stated to his colleagues "that he had perfected an organization for the purpose of selling and disposing of certain bonds secured by real estate mortgage on property located in the City of Tucson . . . and that said organization had properties of value to the corporation" and that "he would carry on the purposes for which the organization (company) was incorporated" if the stockholders would transfer to him, or to such other person as he might designate, "all of the stock of the said corporation, fully paid and non-assessable," and that he would use the stock as a bonus to bond purchasers on the basis of five shares for each $1,000 worth of bonds. This proposition of Poage was accepted, the stockholders agreeing to transfer to Poage "all of the capital stock of said corporation not already transferred" in consideration of Poage's transferring "to

the corporation all of the properties or interests that he might have in the organization he has now perfected,'' etc.

Accordingly, two certificates, one for 1,250 and the other for 1,230 shares, covering the treasury stock, were made out to Poage but were never detached from the stubs. Poage proceeded with the sale of stocks and bonds, the stock being issued directly to the purchaser, and not to Poage. On the face of the stock it was the company's. Such was the fact in connection with the 200 shares sold to the defendant.

At the first stockholders' meeting these promoters, by virtue of the 2,520 shares of the stock they donated to themselves, elected themselves the board of directors of the company; and at the first directors' meeting the plaintiff was elected secretary-treasurer of the company.

The note was transferred to the plaintiff by the company in part payment of what it owed him for advances.

The plaintiff was an active, interested participant in all the steps taken in the incorporation of the company and in its financial methods and plans, and of course is charged with full and complete knowledge of the origin of the note sued on, and is in no better or different position than the company would be as the plaintiff. It is not questioned that the company is an investment company and subject to the Blue Sky Law. The law (section 1888) requires that an investment company, before offering for sale its stocks, bonds and other securities, ''shall file in the office of the corporation commission a verified statement showing in detail the plan upon which it proposes to transact business; a copy of all contracts, bonds, or other instruments which it proposes to make with, or to sell to, its subscribers; an itemized account of its financial condition, the amount of the property

owned by it, and its liabilities and such other information, papers and documents touching its affairs as the commission may require." If the commission after an examination of such statement finds that the investment company "is solvent, that its articles, its constitution and by-laws, its proposed plan of business and proposed contract contains and provides for a fair, just and equitable plan for the transaction of business, and promises a fair return on stocks, bonds, or other securities by it offered for sale," it is the duty of the commission to issue to such investment company a certificate reciting its findings and therein state "that such investment company is permitted to do business in this state. . . . " Section 1890.

No statement as required by section 1888, *supra,* was ever submitted to the corporation commission and no permit as provided in section 1890, *supra,* was ever issued to the company to sell stocks, bonds or other securities; nor is it conceivable that the corporation commission would ever have issued a permit to the company to sell its stocks and bonds upon such a showing as it was capable of making.

Plaintiff contends, however, that the 200 shares of stock sold to defendant was the stock of Poage and not the stock of the company, and that therefore the sale was not in violation of our law regulating investment companies. It is not suggested that it was a part of Poage's promotion stock, but it is said it came out of the treasury stock turned over to Poage for the purpose of financing the company. No certificates of any shares of such stock were ever issued and delivered to Poage. Certificates were filled out to him, but they were never detached from the stubs. They remained in the stock-book and in possession of the company, presumably in the personal charge of the company's secretary-treasurer, the plaintiff.

But, if it be granted that what was done was equivalent to an issuance and delivery of the stock certificates to Poage, still they were not his. He had no right to their proceeds upon a sale. These, according to his agreement with the stockholders, belonged to the company and were for its financing. The whole beneficial interest in the stock was the company's. Plaintiff in his testimony admitted that Poage was only a trustee of such stock.

The recited consideration paid by Poage for the treasury stock was something in a mythical "organization" that Poage had "perfected." What this organization was or what property it had is not explained either in the minutes of the stockholders or the oral testimony. It is remarkable that such an illusive thing should be called a consideration.

The 200 shares sold to defendant were sold as the company's stock and the consideration for them, the defendant's note, was made payable to the company. The plaintiff's complaint alleges that for a valuable consideration the defendant made the note sued on to the company. In view of such an allegation it seems to us plaintiff is in no position to say the consideration for the note was anything other than the 200 shares of the company's stock. He is bound by the allegations of his complaint.

Finally, the note was turned over to plaintiff by the company "to be held by James R. Dunseath until payment of his advances (to the company) is made." In other words, it was left with plaintiff as collateral.

In view of the above facts it seems to us the contention of plaintiff, that the stock sold to defendant was Poage's, is a mere pretense without any basis either in fact or law.

In the face of the admitted and uncontested facts, it is not possible to indulge the presumption, which is necessary to sustain the judgment, that the trial

court found that the 200 shares of stock sold to defendant was the property of Poage. Such a presumption is diametrically contrary to the facts. We find, then, this situation: A domestic investment company has sold to defendant 200 shares of its stock, taking in payment therefor defendant's note for $1,500 and later transferring the note to its secretary-treasurer as collateral for advances made by him for the company, and the secretary-treasurer prosecuting this suit on the note, the investment company not having complied with the law regulating such concerns and not having obtained a permit to sell either its stocks, bonds, or securities or those of any other organization or company or person—a plain violation of the law.

Under the rule laid down by this court in *Reilly* v. *Clyne*, 27 Ariz. 432, 234 Pac. 35, 40 A. L. R. 1005, and in *United Bank & Trust Co.* v. *Joyner*, 40 Ariz. 229, 11 Pac. (2d) 829, the defendant's defense is good and the judgment should have been for him and not the plaintiff.

The plaintiff in his brief earnestly contends that the decision in *Mile Wide Copper Company* v. *Piper*, 29 Ariz. 129, 239 Pac. 799, 43 A. L. R. 1359, is decisively in his favor. The question involved in that case and what was said therein do not bear upon the question we have before us. There it was whether stockholders could recover from a corporation the amount they paid for stock sold to them by a promoter of the company under fraudulent and false representations, and we held their remedy was against the person who had sold them the stock. In this case is involved the right of a domestic investment company or its secretary-treasurer to recover on a note given for stock of the company, it not having complied with the laws governing and controlling such concerns.

The defendant has made a number of other assignments, but we find it unnecessary to pass upon them.

The judgment of the lower court is reversed and the cause remanded, with directions to enter judgment for the defendant.

McALISTER, C. J., and LOCKWOOD, J., concur.