[Civil No. 3656. Filed February 24, 1936.]

[54 Pac. (2d) 793.]

Y. C. WHITE, Superintendent of Banks of the State of Arizona and Receiver of First National Building and Loan Association, Appellant, v. CARMON WOGAMAN and MARION WOGAMAN, Appellees.

Mr. John L. Sullivan, Attorney General, and Mr. Allan K. Perry, Mr. Evo De Concini and Mr. W. Francis Wilson, Assistants Attorney General, for Appellant.

Mr. R. G. Langmade, for Appellees.

LOCKWOOD, C. J.—This is an action by Carmon and Marion Wogaman, hereinafter called plaintiffs, against Y. C. White, hereinafter called defendant, as superintendant of banks of the state of Arizona and thereby *ex-officio* receiver of First National Building and Loan Association, a corporation, hereinafter called the company, to recover from him the sum of $6,000, together with interest thereon, which it is alleged the company owes to plaintiffs. A judgment was rendered in favor of plaintiffs, whereupon this appeal was taken.

There is little, if any, conflict in the facts necessary for the determination of the case, and we state them as follows. The company was organized under the laws of the state of Arizona in November, 1925. Thereafter, and on May 15, 1926, it filed with the Arizona Corporation Commission amended articles of incorporation which were, in fact and law, a reorganization under the provisions of chapter 76, Session Laws 1925, hereinafter called the act. Before the adoption of this act, there was no special provision of the Arizona law explicitly defining building and loan associations, and regulating their organization and operation, though there were a number of sections of the 1913 Code providing for the manner in which certain

phases of their business should be conducted. The act defines building and loan associations as follows:

"Building and Loan Associations are defined hereby to be corporations, societies, organizations or associations having for their object the accumulation by the members of their money by periodical payments into the treasury thereof, to be invested, from time to time in loans to the members upon real estate for home purposes."

It then requires that their articles of incorporation shall contain, among other things, the following provision:

"3. The amount of the par value and the kinds of stock that the association will issue."

Nowhere in the act is there any express authority given such associations to borrow money from nonmembers for any purpose whatsoever, nor are they authorized to do any acts which would necessarily require such borrowing. The articles of the company therefore stated:

" . . . The amount of the capital authorized, shall be twenty million dollars, which shall be divided into three classes of stock, which classes are particularly described as follows, to-wit:

"Class 1. Expense Guarantee (Guaranty) Stock,
"Class 2. Permanent Reserve Guarantee (Guaranty) Stock,
"Class 3. Investors Guaranteed Dividend Stock.

"(a) The Expense Guarantee Stock shall consist of fifty thousand shares of the par value of one dollar per share, which shall be paid for as subscribed for at the rate of one dollar cash per share, . . .

"(b) The Permanent Reserve Guarantee Stock shall consist of two hundred fifty thousand shares of stock of the par value of one dollar per share, which shall be paid for as follows: . . .

"(c) The Investors Guarantee Dividend Stock shall consist of one hundred ninety-seven thousand shares of the par value of one hundred dollars per share,

payable by the subscriber in one installment, or on such suitable installment plans as the Directors of this corporation may, by resolution, provide. . . .

"All stock of the Association may be sold from time to time by the board of directors, who shall provide and issue certificates therefor."

In addition, article 9 thereof reads as follows:

"The highest amount of indebtedness or liability, direct or contingent, to which the corporation is at any time subjected shall never exceed the liability authorized by law."

The by-laws also limited the capital stock of the association to the three kinds above described, and provided somewhat elaborately for the methods of issuing the "Investors Guarantee Dividend Stock." The company was taken over by defendant as an insolvent association on April 7, 1934. Prior to that time, it had collected from various investors some $2,000,000, and some ten or eleven different forms of certificates purporting to be contracts between these investors and the company, defining their respective rights, were issued, aggregating over $1,850,000 book value at the time of the insolvency. Plaintiffs held two so-called "coupon certificates," on which this suit is brought. These certificates, not including the coupons attached thereto, read as follows:

"United States of America
"Number A3–606                              $3,000.00 Dollars
"First National Building and Loan Association Incorporated
"Investor's Guaranteed Dividend Stock Coupon Certificate

"For value received, the First National Building & Loan Association promises to pay Carmon or Marion Wogaman of Phoenix, Arizona, or the registered owner hereof, at the expiration of ten years from the date of this certificate, upon its presentation and surrender to the Association, at its office in the City of Phoenix, State of Arizona, $3,000.00 in legal tender

money of the United States of America, with interest thereon, at the rate of seven per cent per annum, from date hereof, payable semi-annually, at the office of the Association, in the City of Phoenix, State of Arizona, on presentation and surrender of the annexed coupons, as they severally become due.

"The First National Building and Loan Association reserves the right, on or after the expiration of five years from the date hereof; to pay this certificate, on any interest payment date, upon mailing to the recorded owner, written notice, six months prior thereto, and thereupon, said principal sum shall become due and shall be paid upon presentation and surrender of the certificate and all unpaid coupons, to the Association, at its office, in the City of Phoenix, and it may be surrendered after two years from date of issue, at the option of the recorded owner hereof, upon six months' notice, interest to be paid to date of withdrawal. . . . "

Upon the back was found this indorsement:

"Security: As security for the performance of the obligations of the Association hereunder, the Association will hold intact, subject to the examination and inspection of the State Banking Departments, first mortgages on improved real estate, in an amount equal to at least one hundred per cent of its liability hereunder."

There were outstanding certificates substantially like plaintiffs' aggregating about $200,000 face value, but the great bulk of the certificates issued by the company were substantially in one of the two following forms:

"Maturity Value ——      Certificate No. ——
  "First National Building and Loan Association .
               "[Seal.]
         "Phoenix, Arizona
"Serial Date ——        Number Units ——
  "Installment Accumulative Certificate
  "Investors Guarantee Dividend Stock

  "This is to certify that —— of —— is the original recorded owner of the above numbered Installment

Accumulative Certificate issued by the First National Building and Loan Association of Phoenix, Arizona, of the value when matured of $——; that in consideration of the payment by the recorded owner hereof, his heirs or assigns, to the First National Building and Loan Association at its office in Phoenix, Arizona, of $—— monthly in advance for —— months from serial date hereof, the First National Building and Loan Association promises to pay to the then recorded owner hereof, at the expiration of said period, upon presentation and surrender of this certificate, properly endorsed to the First National Building and Loan Association, at its general offices in Phoenix, Arizona, —— Dollars, legal tender money of the United States of America. . . . ''

''Maturity Value ——          Certificate No. ——
    ''First National Building and Loan Association
                    ''[Seal.]
            ''Phoenix, Arizona
''Serial Date ——                    Number Units ——
    ''Installment Accumulation Certificate Fully Paid.

    ''This Is To Certify That —— of —— is the recorded owner of the above numbered fully paid accumulation certificate, issued by the First National Building and Loan Association of Phoenix, Arizona, of the value when matured of $——.

    ''That in lieu of and in full payment of the cash withdrawal value of an Accumulative Investors Guaranteed Dividend Stock Certificate of the same number as shown above, the First National Building and Loan Association promises to pay, at the expiration of —— months from serial date hereof, to the then recorded holder of this certificate, at its offices in Phoenix, Arizona, the sum of $—— in legal tender money of the United States of America. . . . ''

The blanks as set forth above were filled in in an appropriate manner. Of these certificates an aggregate of some $1,300,000 book value was outstanding. Some of these last two classes of certificates had indorsed on them the security clause found on plaintiffs' certificates, and some did not. There was never,

however, any segregation of securities made by the company in accordance with the security clause above for any of the certificates issued by it.

Plaintiffs had paid to the company the sum of $3,000 each for their two certificates above referred to, and had drawn the interest provided by the coupons attached to the certificates several times before the company became insolvent. The receiver admittedly had in his hands, at the beginning of the insolvency, a sum of cash amply sufficient to pay plaintiffs' certificates and all others in form like unto theirs in full, but instead of so paying them, he has used these and other funds collected by him to pay a 30 per cent. dividend on all of the outstanding certificates of the association, in accordance with their book value, and unless prevented by the court, will continue to make payments in that manner. This states the fact sufficiently for a consideration of the law applicable to the case at bar, except as we shall amplify or add thereto in the course of this opinion.

Before proceeding to discuss the law applicable to this situation, we state plaintiffs' and defendant's theories thereof respectively.

It is the contention of plaintiffs that upon the foregoing state of facts they, and others holding certificates like theirs, are not stockholders of the association, but are creditors thereof, while those holding certificates of the other classes set forth herein are stockholders and not creditors, and that under the usual law in regard to insolvent corporations, creditors must be paid in full before stockholders receive anything.

It is the position of defendant that either all of the certificate holders are stockholders of the company, or else they are all creditors thereof, and that in either case they are to be paid ratably in proportion to the

book value of their certificates as they appear on the records of the company.

■ It will thus be seen the vital issue is, What relation do the various certificate holders bear to the company? For there can be no doubt that in case of the insolvency of a corporation, creditors are paid in full before stockholders receive anything, while in the absence of some legal reason to the contrary all creditors have equal rights as among themselves, with a similar situation existing as to all stockholders. In order to determine this question properly, it will involve a somewhat elaborate and extended review of the history, powers and limitations of building and loan associations, viewed particularly in the light of our own statute.

■■ Co-operative building and loan associations have been known for many centuries. Some authorities trace them back almost to the beginning of the Christian era, and state that they are found in some form or another in communities as widely separated as the Chinese Empire and the Grecian Republics. These Chinese societies particularly followed all the basic principles of the modern building and loan association, for they provided for (a) equal contributions at stated periods; (b) fines for failure to make payments; (c) loans made upon competitive bids; and (d) equal distribution of the profits. In modern times their development apparently commenced in England, the first society of which we have any record there having been established in 1781. The first one in the United States was the Oxford Provident Building Association, organized in 1831 in Philadelphia, Pennsylvania, and the movement has extended until in 1932 the number of associations in the United States had reached a total of over 11,000, with a membership of over 11,000,000, and assets of over

$8,000,000,000. These associations are, by their very nature, semi-philanthropic, having a twofold purpose, one to encourage thrift among people of moderate income, and the other to aid them to borrow money for the purpose of the erection or purchase of a home. And their main and indeed their essential characteristic is perfect mutuality, reciprocity, and equality of all of their members. Every gain, every advantage or benefit, and, correspondingly, every loss, must be shared equally by all of the members, be they borrowers or nonborrowers. *Holt* v. *Aetna Bldg. & Loan Assn.*, 78 Okl. 307, 190 Pac. 872; *Leahy* v. *National Bldg. & Loan Assn.*, 100 Wis. 555, 76 N. W. 625, 69 Am. St. Rep. 945. They are, however, the creatures of statutes and have very few, if any, common-law rights, and the statute that creates them must be strictly followed so far as it provides for their existence, powers, rights and liabilities, as well as the rights and liabilities of their members.

It is not too much to say that these institutions, properly regulated and conducted, have done more to encourage thrift, economy and saving among people of moderate income than any other institution of modern times. They offer the best plan yet devised for people of small means to secure their own homes, and for a systematic saving of small sums of money. While the material operations of a building and loan association are wholly financial, yet viewed from a moral and educational angle upon a large number of people, they have an important effect upon the community. They teach their members to save money which might otherwise be wasted. They encourage the man or woman of small means to purchase and own his or her own home. They have been important factors in the uplifting of the wage worker, and, generally speaking, have a moral value above that

which money could buy. When held strictly within their original purpose and limitations, they have proved to be the most economically conducted financial institutions in the world, and have, generally speaking, suffered the least financial loss. Sundheim Building and Loan Association, third edition.

While the essential principles of these associations are the same the world over and at all periods, the details of their operation vary from time to time and from place to place. Two principles, however, have always been considered necessary to make a true building and loan association. *The rights, duties and liabilities of all the members are mutual and on the same basis, and their transactions are among themselves and not with outsiders not members of the association.* Their funds are to be contributed only by members of the association, and they are to be loaned only to such members. Any organization which does not include these principles has departed from the original purpose and methods of these associations, and can justify and legalize its actions only in so far as the statute in the particular jurisdiction where it is organized expressly authorizes such a departure. In the state of Arizona, these general principles which we have thus discussed have been crystallized into the form of statutory law. Section 1 of the act expressly defines these associations as ''corporations, societies, organizations or associations having for their object the accumulation *by the members* of their money by periodical payments into the treasury thereof, to be invested, from time to time in loans *to the members* upon real estate for home purposes.'' (Italics ours.) It is plain, therefore, taking into consideration the history of these associations and our act, that our legislature has expressly limited building and loan associations to organizations containing these two essential principles. Their

funds must be raised by payments from their members alone, and must be used, outside of necessary incidental expenses or purposes expressly permitted by the statute, solely for loans to their members for home purposes. Any organization, no matter what may be its name, which departs from these two fundamental principles, however worthy its purpose in so doing, is not a building and loan association within the meaning of our statute, or else such departure as it has made is *ultra vires*.

However, within these limits, many different variations of the original plan of operations have been adopted. The first associations were generally of what is known as the terminating plan. Under this, all shares of stock were issued as of the same date and amount, and, therefore, always had the same value. All members joined at the same time, or, if they were permitted to enter the organization at a later date, they were compelled to pay, in addition to the amounts already paid by the original subscribers, an extra sum sufficient to put them on the same basis. When this single series of stock matured, the association terminated; its life being limited to this by its charter. The disadvantages of this plan soon became obvious, and a substitute known as the serial or Pennsylvania plan was adopted. Under this, stock is issued in series, annually, semi-annually, quarterly or even monthly, and those desiring to join pay back only to the beginning of the current series, thus enabling one to become a member without making a very large back payment. Each series of stock dates back to the time of its own issue and runs its course independently, without interfering with the others issued before or after. The profits of the association are apportioned in the usual manner, according to the time the series began and number of

shares in the particular series, thus giving each member his dividend proportionate to the amount he has paid in and the time for which it has been paid. When the installments paid up and the profits apportioned to any particular series equals the par value of the stock, it is declared matured.

The so-called permanent plan is but one step further in the development of the serial plan. It differs only in that members may enter at any time, and each member's shares are treated as a separate series. One of these three plans is found in practically all of the building and loan associations organized in the United States in the first three-quarters of the last century.

There is another plan known as the Dayton plan which, however, also complies with the two fundamental principles above mentioned. Under it, there are no regular periodical payments. The member pays any amount he pleases, at any time he pleases, and dividends are apportioned periodically, based on the amount actually paid in. Some of the associations operating under this plan also accept deposits upon which a fixed rate of interest is paid, in the same manner as a savings bank, which do not share in any of the losses, being preferred to shareholders in case of an insolvency. But such a method of business, while perhaps at times good in itself, is a departure from that permitted to true building and loan associations, and cannot be regarded as within the two fundamental principles above set forth.

Nearly all, if not all, of the original building and loan associations, in addition to the two fundamental principles above referred to, included two other factors which contributed to, and indeed were vitally essential for, their remarkable success in operation. First, they were local in their nature, their member-

ship and their loans being confined to a very small area, such as a certain city, township or perhaps a county, thus providing that nearly all of the members had a greater or less personal acquaintance with each other's financial responsibility and property, and the workings of the association. The other factor was that the only expenses chargeable against the profits and assets of the association were a salary, generally nominal in amount, for a part-time secretary who kept the books of the association, and the small amount of printing necessary for its passbooks, records, etc. An association of this character, with very low expenses and comparatively small membership in a definite locality, so that all of the members could be and were perfectly familiar with its financial condition and loans at all times, rarely failed to be extremely profitable to the nonborrowing members, practically the only exception being where the secretary and treasurer deliberately embezzled its funds.

But success always brings imitators, and since the last decade of the nineteenth century, a large number of organizations have been formed, commonly known as "National" associations. These did not confine their business to a small local community, but extended their activities beyond their own states and sometimes to many states. Their new members were not gained, as was the case in all local associations, by mutual and costless word of mouth advertising from members who had profited by their connection with the organization, but through the solicitation of high-powered salesmen and extensive advertising, and there was not a true mutuality and equality of profits and losses, a select group securing an undue proportion of the former, while shouldering most of the losses on the rank and file. As an inevitable corollary of these two factors, the expenses grew and divi-

dends decreased, while the salesmen, in their zeal to make their personal commissions, were generally guilty of *suppressio veri* and not infrequently of *suggestio falsi,* extending in some cases to actionable misrepresentations. The vast majority of these national associations sooner or later became involved in extensive litigation and generally wound up in a state of insolvency, to the tremendous loss of the trusting investors who had believed them to be based on the same sound principles as the local associations above described. Many of the states, as a result of this situation, have adopted such legislation that it has become impossible for organizations of this kind to operate honestly within the law, and they are gradually being driven out of business.

A careful examination of the entire record of this case makes it evident that the company whose operations are under scrutiny was a shining example of one of the worst classes of national associations. It had a complicated form of organization with at least three classes of stock provided for in its articles of incorporation; with ten or a dozen different forms of contracts issued to its investors; and with an apparent attempt to secure funds for its operation from any source and under any conditions, the only limit being "what is necessary to get the money." A casual examination of the provisions of the charter regulating the disposal of the expense loadings, membership fees, fines, penalties, forfeitures and withdrawal values is sufficient to show anyone who is at all familiar with the practical workings of building and loan associations, especially those of this character, that the true object of the organizers was not the "accumulation by the members of their money. by the periodical payments into the treasury thereof, to be invested from time to time in loans to the mem-

bers upon real estate for home purposes," but an attempt, while complying with the letter of the statute, to violate its spirit by securing to two limited classes of stock all the real "cream," and leaving to the great bulk of investors who took the "investor's guarantee dividend stock" the "skimmed milk." We have no hesitancy in saying that the company bears every outward mark of being "conceived in sin and born in iniquity" and that our only wonder is that it succeeded in deceiving the general public as long as it did. But, say plaintiffs, admitting all that can possibly be said in regard to the demerits of the company and its organizers, they are innocent creditors, who, in good faith, loaned their money to the company and are entitled to its return under the principle that the creditors must be paid before stockholders. If it be true that the company was authorized, as a matter of law, to make the particular kind of contract which plaintiffs claim they had with it, to wit, a straight ten-year loan with privilege of call at an earlier date, there can be no question that their contention is correct, for it is not suggested that they did not act in good faith. If, however, the transaction was *ultra vires* because it was not contemplated by the statute that building and loan associations organized thereunder should engage in a general banking and borrowing business for the purpose of raising sufficient funds to loan to their stockholders, the situation is very different. Let us, in view of what we have said, determine whether a building and loan association organized under the Arizona statute is authorized to borrow money from any nonmembers for the purpose of lending it to stockholders. This same question has arisen frequently in the United States where building and loan associations have become insolvent, and there is a great conflict in the decisions.

Two lines of reasoning seem to be followed. The first looks upon building and loan associations as ordinary corporations, with all the inherent rights and liabilities thereof, unless expressly limited by statute. Cases taking this view say, in substance, ''The ordinary corporation may borrow money from any source so long as it is for the purpose of the corporation. The purpose of a building and loan association is to loan money to its stockholders. Ergo, it may borrow money from any source for the purpose of making such loans.'' Cases which are based in substance, though not in express language, upon this type of syllogism hold that certificates of the kind in question are in reality certificates of deposit, creating the relation of debtor and creditor. *Cook* v. *Equitable Bldg. & Loan Assn.,* 104 Ga. 814, 30 S. E. 911; *Wilson* v. *Parvin,* (C. C. A.) 119 Fed. 652; *In re National Bldg., Loan & Provident Assn.,* 12 Del. Ch. 93, 107 Atl. 453; *Bettle* v. *Republic Sav. & Loan Assn.,* 71 N. J. Eq. 613, 64 Atl. 176; *Savannah Real Estate, Loan & Bldg. Co.* v. *Silverberg,* 108 Ga. 281, 33 S. E. 908; *Burt* v. *Rattle,* 31 Ohio St. 116; *Dickinson* v. *Continental Trust Co.,* 23 Misc. 489, 52 N. Y. Supp. 672; *Munhall* v. *Boedecker,* 44 Ill. App. 131. The second considers building and loan associations as corporations indeed, but as corporations of a peculiar and distinct type, with special limitations upon their organization and powers. Their reasoning, stated syllogistically, may be set forth as follows:

''Building and loan corporations are limited by their nature to using only the funds of members, and those for the purpose of securing homes for members only. A creditor of a corporation is not a member thereof. Therefore, a building and loan association cannot secure money in such a manner as to create the relation of debtor and creditor, even to lend it to its members.''

Cases following this reasoning generally hold an attempted loan is *ultra vires,* or else in insolvency (the only situation where the distinction between creditor and stockholder would be vital) hold that all investors are, in equity, stockholders and share ratably in the assets. One of the cases which seems to be nearly on all fours with the present situation is *Teller* v. *Wilcoxen,* 110 Iowa 565, 81 N. W. 772. The court therein says:

"One variety of stock was known as 'Class D.' This was full-paid stock which bore interest at the rate of 8 per cent., payable semi-annually. The promise to pay interest was unconditional. It was in no way dependent on the profits of the association. According to the terms of the stock certificate, the principal could be withdrawn at any time after 60 days' notice. Plaintiff's contention is that he is a creditor, and not a member, of the association, and for this reason is entitled to a preference over other stockholders in the winding up and settlement of the affairs of the corporation. The parties argue this one question, and this alone we shall consider. Plaintiff presents his case upon the theory that his certificate is a note or bond, because of the absolute obligation to pay interest. But this claim is not justified. We find no provision of our statute authorizing an association like this to raise money in any other way than by issuing shares of stock, and the stockholders constitute its membership."

And a preference was denied. In the case of *Towle* v. *American Bldg. & Loan Assn.,* (C. C.) 75 Fed. 938, 939, the court said:

"I very much doubt, too, if the association would have the lawful power to borrow money upon its simple promises to pay, and the takers of the certificates must know the lawful power of the association. . . . The whole scheme of the association is that a number of persons join together to contribute their money to a common fund, so that such common fund may be loaned out under a common administration, and in

that way realize a greater benefit to the contributing parties than separate loans would probably bring.''

In the case of *Leahy* v. *National Bldg. & Loan Assn.*, 100 Wis. 555, 76 N. W. 625, 628, 69 Am. St. Rep. 945, the following language is used:

''The fundamental idea of a building and loan association is mutual profit sharing. Its business necessarily is confined to its own members. Its object is to raise a fund to be loaned to its members. . . . The theory of our statute and the law of all the cases is to the effect that such associations are purely mutual in their character, and that the members share in the common gains, and, from the very necessity of their relations, must bear a proportionate share of the losses. Probably, under our law, such an association would have no right to issue what is called 'definite contract stock.' Such stock is opposed to the fundamental principle of such associations. The members themselves constitute the corporation. It has no capital except such as it receives from its members in monthly installments and its interest earnings.''

While the case of *Sumrall* v. *Commercial Bldg. Trust's Assignee,* 106 Ky. 260, 50 S. W. 69, 71, 90 Am. St. Rep. 223, 44 L. R. A. 659, refers to preferred stock, yet the reasoning set forth in the following language logically would apply to a preferred loan:

''When we bear in mind that the corporation we are dealing with is a building and loan association, with certain underlying principles of co-operation, equality, and mutuality in its make-up not common to ordinary corporations, and which may be termed the 'common law of its existence,' the objections to upholding preferential contracts among members become apparent. All such attempts are absolutely void, as contrary to the natural law of such associations. If their managers may attract investors by selling them preferred stock,—preferred either as respects dividends or capital,—the burdens of maintain-

ing the organization, and in all probability all the losses of the concern, in case of embarrassment or insolvency, will fall on the very class of members who were primarily intended to be benefited by such associations. In *King* v. *Investment Union* [170 Ill. 135], 48 N. E. 677, it was said: ''The plan of issuing stock containing such agreements is entirely foreign to the purposes of the corporation contemplated by the statute under which the one at bar was organized, and we can but regard it as of no force and effect.' To the same effect are the cases of *Trowbridge* v. *Hamilton,* [18 Wash. 686] 52 Pac. 328, and of *Wierman* v. *Investment Union,* 67 Ill. App. 550, although in these cases a by-law undertook to authorize the contract of preference.''

█ Taking into consideration the language of our statute defining building and loan associations, the limitations, purpose and methods of operation of associations of the kind so defined in the past, and the utter destruction of the fundamental principles of mutuality and equality of rights and responsibilities given if they are allowed to borrow funds generally from nonmembers to loan to their members, we are of the opinion that a corporation organized under the law of Arizona as a building and loan association has no power to borrow money from nonmembers, even for the purpose of loaning it to members, and that an attempted loan so made is *ultra vires* and beyond the power of the association either to make or to ratify, anything in its charter or by-laws contained notwithstanding. Such being the case, plaintiffs were not entitled to recover on the theory that they had made a valid loan to the company. Equity, however, will not leave them remediless, but will treat them rather as having contributed money to the company in the only possible legal manner in which, under the law, it could be done, to wit, by becoming members of the association, and, therefore, shareholders. As such,

they are entitled to participate in the dividends made by defendant in the same manner as any other shareholder, ratably according to the book value of their shares.

The judgment of the superior court is reversed and the case remanded, with instructions to render judgment for defendant.

McALISTER and ROSS, JJ., concur.