[Civil No. 3535. Filed March 16, 1936.]

[55 Pac. (2d) 648.]

M. H. DURHAM, Appellant, v. FIRESTONE TIRE & RUBBER COMPANY OF CALIFORNIA, a Corporation, and FIRESTONE SERVICE STORES, INC., OF PHOENIX, a Corporation, Appellees.

Messrs. Mathews & Bilby, Mr. Odin B. Dodd and Mr. J. Bolivar Sumter, for Appellant.

Messrs. Conner & Jones, for Appellees.

LOCKWOOD, C. J.—This is an appeal from a judgment in favor of Firestone Tire & Rubber Company of California, a corporation, hereinafter called the California company, and Firestone Service Stores, Inc., of Phœnix, an Arizona corporation, hereinafter called the Phoenix company, against M.. H. Durham, defendant, rendered upon certain directed verdicts.

From the order overruling the motion for new trial and the judgment, this appeal is taken.

The suit was brought by the California company, and the pleadings are very lengthy. We therefore summarize only so much of them as is necessary to explain the issues on this appeal. The complaint contains two causes of action; the first being upon a promissory note which is alleged to have been made, executed and delivered by defendant to the California company, for a valuable consideration. The second is based upon a written guaranty of certain accounts receivable assigned by defendant to the same company. The defendant moved that the Phoenix company be made a cross-defendant, which motion was granted, and then answered, admitting the execution and delivery of the note and guaranty set up in the complaint, but denying that there was any consideration therefor. He alleged that about the 14th of December, 1929, he entered into a contract, in writing, with the California company and the Phoenix company, whereby they agreed to sell to defendant, and he agreed to purchase, certain shares of the capital stock of the Phoenix company, of the par value of $20,000; that in payment for said stock he gave to the California company the promissory note, the guaranty of certain accounts receivable, and various other things of value. He claimed, in substance, that the Phoenix company, which was incorporated under the law of Arizona, as of August 10, 1929, was a corporation of the class described in section 1887, Revised Code of 1928, as a domestic investment company which, under the law, is required before selling any of its stock to make certain reports to the Corporation Commission and to comply with the proper orders of the commission; that he was not one of the persons who

associated themselves together to form said Phoenix company, and that the said company had never complied with the provisions of section 1888, Revised Code of 1928, nor with a certain order of the Corporation Commission known as No. 117–B, and that by reason of the premises the contract of sale and purchase of the stock was void. He further alleged that plaintiff had not exercised due diligence in attempting to collect the guaranteed accounts, nor notified the defendant that the debtors were insolvent, nor reassigned the accounts to defendant. He then filed a cross-complaint, in which he set up the same facts as alleged in his affirmative defense, and asked that he recover from the California and Phoenix companies the amount which he had paid them for purchase of the stock aforesaid through cash, merchandise, and accounts receivable, and that the note and guaranty be surrendered.

The plaintiff and the cross-defendant replied to defendant's cross-complaint, denying that the cross-defendant was an investment company as defined under section 1887, *supra,* or had sold, or offered to sell, any stock, except to the associates who caused it to be organized, and denying that plaintiff had not used due diligence in attempting to collect the guaranteed accounts, or that it was required to notify defendant that it had been unable to collect them, or to reassign the accounts in question unless and until the guaranty had been performed.

Defendant demurred to the answers to the cross-complaint, but this demurrer was by the court overruled. The case was then tried before a jury upon the complaint, defendant's amended answer and cross-complaint, and the answer of the companies to the latter. Various witnesses were introduced and documentary evidence submitted, and the parties rested.

Thereupon plaintiff moved the court for instructed verdicts in favor of plaintiff on its first and second causes of action and for plaintiff and cross-defendant on defendant's cross-complaint, which motion was granted, and upon such verdicts the judgment appealed from was rendered.

There are eleven assignments of error properly grouped under seven propositions of law, which we shall consider as seems advisable. The first is based on the theory that the Phoenix company was a domestic investment company, within the definition of section 1887, *supra,* which had not complied with the provisions of section 1888, *supra;* that defendant was not one of the persons who had associated themselves together to form the Phoenix company, and that therefore the sale of stock therein to him, which was admittedly the sole consideration for the note, guaranty, and other considerations paid by him to the California company, was void. Under section 1887, *supra,* every corporation which sells its stock to any other person except "those who associated themselves together to form such company and other than those specifically exempted herein . . . " is a domestic investment company, and therefore subject to the provisions of chapter 38, Revised Code of 1928, regulating the sale of securities by such companies and commonly known as the "Blue Sky" Law. The Phoenix company was admittedly incorporated under the laws of Arizona by H. M. Fennemore, T. C. Nairn and R. M. Fennemore as of August 10, 1929; defendant not signing the articles nor being named therein as an incorporator. It is the contention of defendant that the persons "who associated themselves together to form such company," under section 1887, *supra,* mean only those whose names are subscribed to the articles of incorporation, and, since de-

fendant was not one of them, a sale of stock to him by the Phoenix company automatically made it a domestic investment company. It is the contention of plaintiff that these words are not to be used in the limited sense claimed by defendant, but that it includes, not merely the actual incorporators, but all those at whose instance the company has been organized.

In determining this question, we think we should consider the intention and the purpose of the legislature in enacting the Blue Sky Law. We have stated this in *Reilly* v. *Clyne*, 27 Ariz. 432, 234 Pac. 35, 38, 40 A. L. R. 1005, as follows:

"The aim of the courts has been to carry out the manifest intention of the statutes, of preventing the public from being imposed upon by questionable and unsound financial schemes of fortune dreamers and dishonest promoters, and to reach all get-rich-quick schemes offering to the general public their stocks and securities, under whatever name they may choose to act."

The Blue Sky Law as originally adopted, construed literally, covered every corporation which sold stock, bonds or other securities to any persons whatsoever. Under its terms, even the so-called "close" corporation, organized at the behest of a limited number of persons for convenience in carrying on their own business, and with no intention of any securities ever being sold to any person except those who had arranged for its organization, was subject to all the rigid provisions of the law. It soon became obvious that it was unnecessary and absurd to attempt to protect the public from a corporation which had a fixed and definite intention not to sell any of its stock or securities to the public, but to retain them for its organizers. The legislature, therefore, not wishing to impose an unnecessary burden upon such

corporations, modified the statute by adding the words "other than to those who associated themselves together to form such company," thus obviously exempting them from the Blue Sky Law. There can be no dispute that this was the purpose of the addition to the statute, and, this being true, we think it is erroneous to say that the persons excepted are limited to those who actually sign the articles of incorporation. It is notorious that a very large percentage of the articles of incorporation adopted in almost every state are not signed by all, or even a large part, or, at times, any, of the real parties in interest who are associated for the purpose of organizing it. They are frequently, if not generally, signed only by the attorneys who perform the legal services necessary for the organization, or some members of their staff, and at the first meeting, after the formal steps necessary to make it a legal entity have been completed, the control is turned over to the real associates or such of them as are chosen by their co-associates to manage the affairs of the corporation. We are of the opinion that, as a matter of common sense and correct practice, the words "those who associate themselves together to form such company" were meant by the legislature to mean, and should be construed to mean, "all persons who *before the formal organization of the corporation,* had aided and assisted in or advised and encouraged its organization, with the definite intention and expectation that they should become stockholders or bondholders therein." We hold, therefore, that the fact that defendant did not actually sign the articles of incorporation does not of itself exclude him from the class set forth in the exception to section 1887, *supra.*

The next objection of defendant is that, even admitting this to be true, the record shows clearly

that "those who associated themselves together" to form the company included a corporation, to wit, the California company, which, by agreement, was to own always at least 51 per cent. of the stock of the Phoenix company, and that as a matter of law, one corporation may not organize or subscribe to the original stock of another, and that the organization of the Phoenix company was therefore void and its stock was worthless, and there was no consideration for the note, guaranty, and other property given by defendant to the California company. It is urged by plaintiff that under section 583, Revised Code of 1928, defendant may not raise this issue of illegal organization. This section reads as follows:

"Estoppel to deny corporate existence. Persons acting as a corporation shall not be permitted to set up or rely upon the want of a legal organization as a defense to any action brought against them as a corporation, nor shall any person who may be sued on a contract made with such corporation, or sued for an injury done its property, or for a wrong done its interests, be permitted to rely upon such want of legal organization, in his defense."

There is a serious question whether, under the provisions of this section, defendant is not estopped from raising the question under discussion, but, assuming for the sake of argument that he may do so, we still think the point is not well taken. There is undoubtedly considerable conflict in the authorities as to whether one corporation may participate in the organization of another. Among those cases holding that it may not are found such as *Nebraska Shirt Co.* v. *Horton,* 3 Neb. (Unof.) 888, 93 N. W. 225; *Denny Hotel Co.* v. *Schram,* 6 Wash. 134, 32 Pac. 1002, 36 Am. St. Rep. 130; *Moore* v. *Los Lugos Gold Mines,* 172 Wash. 570, 21 Pac. (2d) 253; *Schwab* v. *E. G. Potier Co.,* 194 N. Y. 409, 87 N. E. 670, and

others. Apparently this is based, although not always so expressed, upon the idea set forth in *Nebraska Shirt Co.* v. *Horton, supra,* in the following language:

"Corporations have quite enough power without allowing them to incorporate themselves in new companies."

Stated as a general proposition, there may be merit in this theory, but we think there is at least one well-grounded exception thereto. Where the obvious purpose of the new corporation is merely to act as a subsidiary for the parent one, and to carry out the purposes for which the parent itself was formed, we see no reason why, in the absence of a statute forbidding it, a corporation, as a matter of principle, should not be permitted to participate in the organization of its subsidiary. Unless prohibited by law, if its articles are broad enough, it can purchase stock in another such a corporation *after* the latter is organized, and, through such purchase, control the operations of the other company, and, if it may do this, it would be extremely technical to say that it may not, through its duly authorized agents, organize the new company in the beginning. If the new company were organized for the purpose of evading limitations placed on the rights and authority of the parent company, the situation might be very different, but in the present case there can be no doubt that the Phoenix company was organized for the purpose of assisting in the better and more profitable disposition of the very product which the California company was engaged in producing and distributing. *Rubino* v. *Pressed Steel Car Co.,* (N. J.) 53 Atl. 1050; *Kardo Co.* v. *Adams,* (C. C. A.) 231 Fed. 950; *Parkside Cemetery Assn.* v. *Traction Co.,* 93 Ohio St. 161, 112 N. E. 596, Ann. Cas. 1918C 1051. We hold, therefore, that under the law of Arizona a corporation

is not prohibited from subscribing to or holding the stock of a new corporation whose purpose is naturally subsidiary to, and in aid of, the business of the old corporation.

But, assuming that one who did not sign the articles of incorporation may have been one of those who associated themselves together to form the Phoenix company, and assuming that the California company could be and was, through its agents, one of the principal subscribers to the original stock of the Phoenix company, does it appear that defendant was, as a matter of law, an "associate" in the organization of the latter? It is defendant's contention that the evidence shows he was not an "associate" with the California company in the organization of the Phoenix company within the meaning of the word as we have defined it, and that the sale of stock to him was made *after* its organization. If his contention be true, then the Phoenix company was a domestic investment company, subject to the provisions of the Blue Sky Law, and since, admittedly it had not received the permit to sell its securities required of companies subject to that law, under the authority of *Reilly* v. *Clyne, supra; United Bank etc. Co.* v. *Joyner*, 40 Ariz. 229, 11 Pac. (2d) 829; *Davis* v. *Dunseath*, 41 Ariz. 57, 15 Pac. (2d) 946, the contract for the sale of the stock to him was void, and there was no consideration for his note, guaranty and transfer of assets to the California company, so that the judgment should have been for him on the complaint. On the other hand, if, as a matter of law, he was "associated" with the California company for the purpose of forming the Phoenix company, his defense fails, and the judgment rendered was correct, at least as to the first cause of action. What does the record show on this point? The trial court

granted an instructed verdict, stating in substance that it was satisfied from the evidence that, as a matter of law, the defendant was an associate within the meaning of the statute. The defendant at the trial denied categorically and positively from the witness stand that he had at any time had anything whatever to do with the organization of the Phoenix company, and stated that before August 15, 1929, he had never in any way, shape, nor fashion agreed to become a stockholder therein. This was confirmed by other testimony in the case. It is true that there was also evidence which would have justified the trial court or the jury in taking a contrary view as to the facts in issue, but we think the record shows there was a conflict of evidence upon that point, and that it was a question for the jury, under proper instructions and definitions, to say whether he was in fact an associate in the formation of the Phoenix company.

■■ It is urged that the trial court in granting the motion for instructed verdicts stated that, had it submitted the case to the jury and had the latter returned verdicts for the defendant, it would have felt compelled to set them aside because they were contrary to the weight of the evidence, and plaintiff claims that, such being the case, it properly directed the verdicts for the plaintiff. We think that the action and statements of the learned trial judge, in this behalf, were based on a misunderstanding of the law of Arizona governing the respective powers of jurors and trial courts. A trial judge may set aside a verdict and grant a new trial when he considers the verdict contrary to the weight of the evidence. The effect of his action is to send the case for trial before a second jury, and, if that jury should also render a verdict which, in the opinion of the trial judge, is subject to the same objection, he may once again set

it aside, but, if a third jury reaches the same conclusion, his power to set aside the verdict for the reason that he believes it against the weight of evidence is exhausted. Section 3849, Revised Code of 1928. Nor in this state may the trial judge render judgment *non obstante veredicto*. *Welch* v. *United Mut. Ben. Assn.*, 44 Ariz. 198, 36 Pac. (2d) 256. It is only when there is no evidence in the record which would justify a reasonable man in returning a verdict in favor of one party that the trial judge is authorized to direct a jury to return it in favor of the other one. Since we cannot affirmatively say from the records that no reasonable man could have believed that the defendant was not an associate in the formation of the Phoenix company, the trial judge should have submitted the case to the jury, so far as issues raised by the complaint were concerned, at least.

We consider next the cross-complaint. The instructed verdict in favor of plaintiff on defendant's cross-complaint was based by the trial court on two grounds; the first that the statute of limitations had run against it, and the other that the evidence was not sufficient to sustain a verdict in favor of defendant. In determining whether the first ground was sufficient, we must consider the statute of limitations and determine the nature of the cross-complaint. It was filed between two and three years after the alleged cause of action set forth therein arose, and obviously the trial judge must have believed that it fell within either sections 2058 or 2059, Revised Code of 1928. These sections prescribe limitations of one and two years, respectively, for the classes of action set forth therein. Upon examining them carefully, it is plain that the only actions mentioned in either of them which could by any theory have been held to cover

the cross-complaint are those of trover, detinue, and conversion. It is the position of defendant, on the other hand, that the action falls either under subdivision 3 of section 2060 or section 2063, Revised Code of 1928. Subdivision 3 reads as follows:

"For relief on the ground of fraud or mistake, which cause of action shall not be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake,"

and the period of limitations is three years. Section 2063 is the omnibus section, covering all forms of action not expressly governed by other portions of the statute, and is for four years. The question has been twice before the Supreme Court of California on a state of facts analogous to those of the case at bar, in the cases of *MacDonald* v. *Reich,* 100 Cal. App. 736, 281 Pac. 106; *Young* v. *Three For One Oil Royalties,* (Cal. App.) 24 Pac. (2d) 894. In both of these the action was held to be founded on fraud, and the three-year statute was applied. It is true that there is no contention that in this case the California company deliberately intended to defraud defendant, all of the evidence showing that it believed in good faith that, under the circumstances, it was not required to comply with the Blue Sky Law. The fraud was legal or constructive, rather than actual. We have stated in *Harrison* v. *Roark,* 31 Ariz. 73, 250 Pac. 367, 369:

"The principal difference between 'actual' and 'constructive' fraud is that in the first case there is an intent to induce another to part with property or surrender some legal right, while in the other, although the act may accomplish that purpose, there is no such intent on the part of the actor. The presence or absence of such an intent distinguishes 'actual' from 'constructive' or 'legal' fraud."

We are of the opinion that the statute of limitations had not run as against defendant's cross-complaint.

There remains the question as to whether the evidence would have sustained a judgment in favor of defendant upon his cross-complaint. It appears from the uncontradicted record that, when defendant turned his business in Tucson over to plaintiff, it assuming the liabilities and taking the assets, an accounting was had, and it was agreed the net assets amounted to the sum of $10,472.36. This result was obtained, however, by including as gross assets all of the accounts receivable of defendant which were assigned to plaintiff, amounting to $12,971.49 at their face value. The evidence shows that a considerable portion of these accounts receivable were never collected by plaintiff. The defendant is entitled to recover on his cross-complaint, if anything, only the actual value of what he paid to plaintiff on the stock contract. If the bills receivable which he turned over to it were not really worth their face value, the amount which he would be entitled to recover, at the most, would be $10,472.36, less the difference between the face value of the bills receivable and their actual value. In fixing this actual value, it will, of course, be necessary to determine how much of the bills receivable were uncollected by plaintiff during the time they were in its possession, and whether the failure to collect was due to the fact that the accounts were by reasonable efforts uncollectible, or that plaintiff was negligent in the handling thereof. These issues will doubtless be properly disposed of by the trial court at the next trial.

For the foregoing reasons, the judgment of the superior court of Pima county is reversed and the

case remanded, with instructions to grant a new trial to defendant upon the issues of the complaint and the cross-complaint, in accordance with the principles of law expressed herein.

McALISTER and ROSS, JJ., concur.