[Civil No. 3992. Filed November 14, 1938.]

[84 Pac. (2d) 70.]

FIDELITY BUILDING AND LOAN ASSOCIATION, a Corporation, Appellant, v. J. J. COX and MARY COX, His Wife, and B. SALAS, Appellees.

Mr. D. P. Skousen, for Appellant.

Messrs. Bakery & Whitney, Mr. Lawrence L. Howe, and Mr. Harold E. Whitney, of Counsel for Appellant on the Brief.

Mr. George D. Locke, Messrs. Cox & Moore, and Mr. J. Bolivar Sumter, for Appellees.

LOCKWOOD, J.—Fidelity Building and Loan Association, a corporation, hereinafter called plaintiff, brought suit against J. J. Cox and Mary Cox, his wife, hereinafter called defendants, and others, to foreclose a mortgage covering lots 1, 2, 3 and 4, in block 33 of the town of Glendale. Judgment was rendered that plaintiff take nothing by its suit, and that it be barred from any claim against or an interest in the property set forth in the mortgage, and from said judgment this appeal was taken.

Plaintiff based its claim upon a note and mortgage given by one John D. Frahm, now deceased, payable in monthly amortized installments. Frahm disappeared and presumably died in November, 1928, and his estate was administered, J. J. Cox, one of the defendants herein, purchasing at probate sale all of the assets of the estate, including the property covered by the note and mortgage. At the time of the execution of the note and mortgage, Frahm had also purchased fifty shares of stock in the plaintiff. Many payments were made by him and his successor in interest, Cox, on the note, but not sufficient to satisfy it, and since it was considerably in arrears, this suit for foreclosure was brought.

Defendants admitted the execution of the note and mortgage by Frahm and his purchase of the stock in the plaintiff, and that the property had passed, by order of the probate court, to defendant Cox. They set up, however, that they had been unable to obtain a statement from plaintiff, showing the true amount still due on the mortgage and the payments made on the stock, and further alleged that the stock had been sold by plaintiff in violation of chapter 9 (tit. 9, section 2259 et seq.), Revised Statutes Arizona 1913, commonly known as the "Blue Sky" law; that Frahm had paid on its purchase price the sum of $1325, and was

entitled to recover from plaintiff that amount, or have it credited upon the note and mortgage. The prayer was for an accounting as to how much, if any, was due plaintiff, and that if nothing were found to be due, that defendants' title to the mortgaged premises be quieted.

The case was tried to the court, sitting without a jury, and it found that the note had been reduced by various payments made directly thereon by Frahm and his successors in interest to $1312.72; that the stock in question was sold to Frahm in violation of the "Blue Sky" law, and that plaintiff had led the administrator of the estate of Frahm, and Cox, before the latter purchased the property, to believe that said stock certificate was valid and that there had been paid thereon the sum of $1325. The judgment was that plaintiff take nothing by its suit, and be barred of any claim against, or interest in, the mortgaged property.

There are many assignments of error, but we think the case can, and should, be determined by us on certain general propositions of law raised by the assignments as applied to the evidence in the case, rather than by considering these assignments *seriatim*. The evidence reasonably supports the findings of the trial court that after deducting from the amount of the original loan, with interest, the amount of payments made by Frahm and his successors in interest directly thereon, there was still due to plaintiff the sum of $1312.72. If that were all, it would have necessarily followed that judgment should have been given against defendant Cox and his wife, who, in their pleadings, admit that they agreed to assume the payment of the note and mortgage, for that amount, and for a foreclosure of the mortgage.

The real bone of contention in this case is as to whether defendants were entitled to an offset against

the amount due on the mortgage of anything on account of the stock hereinbefore referred to. It is the theory of defendants (a) that the stock in question was sold to Frahm in violation of the terms of the "Blue Sky" law, (b) that if this were true, he was entitled to recover from plaintiff the full amount paid for the stock, (c) that the evidence shows, either directly or by presumption of fact, that he had paid for said stock the sum of $1325, or (d) if it was not actually paid that plaintiff is estopped to deny the payment.

It is the contention of plaintiff (a) that the sale of the stock was not made in violation of the "Blue Sky" law or any other law of the state, and that Frahm, therefore, took it subject to the terms of his contract of purchase with plaintiff; (b) that the evidence shows that he had paid thereon only the sum of $200, and that the rules and regulations of plaintiff, to which Frahm assented when he purchased the stock, provided that it had no value on account of his failure to make the balance of the payments thereon, and (c) that plaintiff is not estopped from this contention. The first question then for our consideration is whether the sale of the stock was made in contravention of the terms of the "Blue Sky" law.

It is clearly shown by the evidence that before the sale of the stock, plaintiff had complied with the provisions of sections 2231 to 2242, Revised Statutes Arizona 1913, and had been issued a certificate by the corporation commission, licensing it to do business as a building and loan association within the state of Arizona, but that it had not attempted to comply with the provisions of sections 2259 and 2271, Revised Statutes Arizona 1913, relating to investment companies, and commonly known as the "Blue Sky" law. The question before us then is whether the code of 1913, which was in force at the time the stock was sold to Frahm,

required foreign building and loan associations desiring to do business within the state of Arizona to comply with the provisions which specifically govern such associations, and also with those governing investment companies in general, as prerequisite to selling any of their stock within the state of Arizona.

The code of 1887, in chapter 7, title 12, section 347 et seq., provides certain general regulations for foreign corporations which desire to do business in the state of Arizona. Chapter 4 of said title, section 283 et seq., also provides for the organization of savings and loan corporations within the state of Arizona. A comparison of the two chapters shows clearly that all that a foreign savings and loan corporation was then required to do, in order to engage in business in the state of Arizona, was to comply with the general provisions of the law regarding foreign corporations, which were, substantially, to file a copy of the articles of incorporation and to make an appointment of an agent within the territory. There was no special regulation of foreign building and loan corporations or of investment companies of any nature at that time. The provisions of chapter 4, *supra,* were carried forward to the Civil Code of 1901 as chapter 6, title 13, section 827 et seq., with some modification, and those of chapter 7 were carried forward, in substance, as chapter 9, section 909 et seq., but an addition was made to chapter 9, applying specifically to foreign building and loan associations. Section 914 of that code reads as follows:

"Hereafter no building and loan corporation, company or association organized under the laws of this or any other state, territory or foreign country shall be permitted to do or transact any kind of building and loan business in this territory, until such corporation, company or association, *in addition to all other requirements of law,* shall have made, executed and deposited with the territorial treasurer a good and

sufficient bond, with two or more sureties, in the sum of fifty thousand dollars, for the benefit and security of its stockholders residing in this territory.'' (Italics ours.)

The chapter continues with various other matter, and concludes with the following language:

''925. Any person or agent or otherwise who shall solicit investments or issue or deliver any certificate of stock in this territory for or on account of any foreign building and loan corporation, company or association, which has not complied with the provisions of this chapter, shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding two hundred dollars nor less than fifty dollars, or by imprisonment in a county jail not exceeding three months.''

It is apparent from these two sections that before a foreign building and loan association could sell stock or solicit investments in Arizona, it was not only compelled to put up $50,000 in negotiable security or a bond of the same amount to protect the purchasers of its stock in Arizona, but that it was also required to do any and all other things which the law made a condition precedent to doing business in the state.

The regular session of the legislature of 1912 adopted chapter 69, commonly called the ''Blue Sky'' law, which defined investment companies and stated what should be required of them before they sold any stock in the state. The following sections of that law show clearly that building and loan associations fall within the definition of an ''investment company'':

''Sec. 1. Every corporation, every copartnership or company, and every association (other than State and National banks, and corporations not organized for pecuniary profit) organized, or which shall be organized, in this State, whether incorporated or unincorporated, which shall sell or negotiate for the sale of any stock, bonds, or other securities of any kind

or character other than bonds of the United States, the State of Arizona bonds, or bonds of some county, city, town or school district therein, to any person or persons in the State of Arizona, other than those specifically exempted herein, shall be known for the purposes of this Act as a domestic investment company. Every such investment company organized in any other State, or government, or organized under the laws of any other State or government, shall be known for the purposes of this Act as a foreign investment company.

"Sec. 2. Before offering for sale, or attempting to sell, any stocks, bonds, or other securities of any kind or character other than those specifically exempted in Sec. 1 of this Act, to any person or persons, or transacting business of any kind whatever in this State, excepting that of preparing the instruments hereinafter required, every such investment company, domestic or foreign, shall file in the office of the Corporation Commission of this State, the following instruments, to-wit: A statement showing in full detail the plan upon which it proposes to transact business; a copy of all contracts, bonds, or other instruments which it proposes to make with, or sell to, its subscribers; a statement which shall show the name and location of the investment company, and an itemized account of its actual financial condition, and the amount of the property owned by it, and its liabilities, and such other information touching its affairs as the Corporation Commission may require.

"If such investment company be a copartnership or an unincorporated association, it shall also file with the Corporation Commission a copy of its articles of copartnership and all such other papers pertaining to its organization as may be required by the Corporation Commission.

"All such investment companies shall also file in the office of the Corporation Commission such other instruments and documents as may be required by the general laws of this State appertaining to corporations, both foreign and domestic, and such other papers and documents as the Corporation Commission may require."

It then set forth a very careful and elaborate method for satisfying the corporation commission as to whether a license to sell stock should be issued to it, and provided a penalty for the sale of stock in violation of the law. At the first special session thereafter, chapter 9 of the code of 1901 was amended by chapter 20 of that session, by requiring all foreign corporations desiring to do business to publish their articles of incorporation, and to pay a license fee to the corporation commission, which should then issue a license to do business in Arizona. Such corporations were also forbidden to remove a proceeding brought in the state courts to the federal court, on penalty of having their license revoked. But neither in chapter 9 nor chapter 20, *supra,* was there any attempt to repeal section 914, *supra.* The legislation thus adopted was carried forward into the code of 1913 as chapters 7 and 9 of that code (sections 2226 et seq., 2259 et seq.), section 2231 of that code being the same as section 914 of the code of 1901.

The question then is, whether it was the intent of the legislature to require of building and loan associations, which desired to do business under the laws of Arizona, that they comply with the general provisions of the statute of 1912 regulating investment companies, as well as those specifically applying to building and loan associations, before they were permitted to sell stock, or whether it was intended that building and loan associations, being already regulated by a specific law in regard to the sale of their stock, were relieved of the necessity of complying with the "Blue Sky" law.

Building and loan associations have always been regarded by this state as a type of organization distinct from that of the ordinary business company, and have been regulated by special acts in addition to the general corporation statutes. Their stock is of

a different type of that of the ordinary corporation, and the rights and limitations of stockholders are different. *White* v. *Wogaman,* 47 Ariz. 195, 54 Pac. (2d) 793. This is on the theory that purchasers of stock therein are generally of a class requiring extraordinary protection against misrepresentations and losses. So much is this true that finally our legislature excluded foreign building and loan associations entirely from doing business in Arizona. Chapter 76, Laws 1925. In view of the nature of these corporations and the history of our legislation in regard thereto, we are of the opinion that when the legislature, after the enactment of the "Blue Sky" law, carried forward into the 1913 code, section 914 of the code of 1901, which expressly provided that the special requirements of that section were "in addition to all other requirements of law," that it intended the "Blue Sky" law of 1912, within whose definition of investment companies building and loan associations clearly fall, to apply to such associations. Such being the case, the sale of the stock in question to Frahm was absolutely void. *Reilly* v. *Clyne,* 27 Ariz. 432, 234 Pac. 35, 40 A. L. R. 1005; *Davis* v. *Dunseath,* 41 Ariz. 57, 15 Pac. (2d) 946; *United Bank & Trust Co.* v. *Joyner,* 40 Ariz. 229, 11 Pac. (2d) 829. And the money paid to the plaintiff for this stock could be recovered by Frahm or his successors in interest. *Durham* v. *Firestone Tire & Rubber Co.,* 47 Ariz. 280, 55 Pac. (2d) 648. The question then arises how much was paid upon the stock.

■■ It is urged most strenuously by defendants that the presumption of law is that Frahm continued the payments on this stock during his lifetime. Many cases are cited by them as sustaining this proposition. We have examined them all carefully but find that none of them are in point. In a suit to recover money paid, whether the recovery is sought in a com-

plaint or cross-complaint, or is set up as a matter of defense, the general rule, supported by an overwhelming weight of authorities, is that the burden of proof is upon the party who seeks the recovery. 48 C. J. 771 and cases cited. We think, therefore, that when defendants claimed the payment by Frahm of any particular sum upon this stock, it was incumbent upon them to prove it by a reasonable preponderance of the evidence. We have examined the record carefully and the only evidence bearing directly upon this point is certain ledger sheets of the plaintiff, which show the payment of eight installments of $25 each only. We are of the opinion that there is no evidence in the record to sustain a finding that more than that amount was ever paid upon the stock in question.

But defendants urge that plaintiff is estopped to deny payment of the full amount of $1325. Apparently this is based upon the fact that during the negotiations had concerning the note and mortgage by the administrator of Frahm's estate with the plaintiff, a written inquiry was made as to the value of the stock, in the following language,

"I notice from the mortgage that Mr. Frahm contracted to purchase shares of stock in your company. I should like to know if this is still in Mr. Frahm's name, and if so what equity he has in it. This information is necessary in drawing up an inventory of the estate,"

and plaintiff failed to respond to such inquiry by giving any particular value thereto. We think this is entirely insufficient to sustain the theory of petitioner. So far as the record is concerned, plaintiff made no representations whatever to either defendants or the administrator of the Frahm estate, prior to the purchase of the land in question by defendants, as to the value of the stock. It simply failed to answer an in-

quiry which was not based upon an assumption or claim made by the administrator or by defendants to plaintiff, that the stock had any particular value. To hold that such a failure to disclose entitles defendants to assume that the stock was of the value of $1325, because that amount had been paid thereon, is going entirely too far. We think the plea of estoppel is not sustained by the record.

It, therefore, appears that the finding of the trial court that the allegations and averments of the answer pleaded by way of estoppel were sustained by the evidence is incorrect and that there was still due to plaintiff from defendants at least $1112.72 on the note in question, after deducting therefrom the full amount of money which the evidence shows was paid upon the stock. Since this is true, the trial court should have rendered judgment in favor of plaintiff for the amount still due, and ordered a foreclosure of the mortgage.

The judgment is reversed and the case remanded for a new trial, in accordance with the opinion expressed herein.

McALISTER, C. J., and ROSS, J., concur.